NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0638n.06

No. 09-4354

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Aug 29, 2011*

LEONARD GREEN, Clerk

UNITED STATES OF AMERICA,            )
                                     )        ON APPEAL FROM THE
        Plaintiff-Appellee,          )        UNITED STATES DISTRICT
                                     )        COURT FOR THE
v.                                   )        NORTHERN DISTRICT OF
                                     )        OHIO
MICHAEL B. MAY,                      )
                                     )              O P I N I O N
        Defendant-Appellant.         )


BEFORE:    ROGERS, McKEAGUE, Circuit Judges; DONALD, District Judge.[*]

    **McKeague, Circuit Judge.** Defendant Michael B. May appeals his conviction for being a

felon in possession of a firearm, arguing that there was insufficient evidence to link him to the

firearm. May also challenges the sentence imposed, arguing that an enhancement for reckless

endangerment and $1,000 fine were improper. For the reasons that follow, we **AFFIRM** both the

conviction and sentence.

## I. Background

    On August 26, 2008, at approximately 12:30 a.m., Officer Eric Williams ("Williams") and

Sergeant Christopher Svec ("Svec") of the Cuyahoga Metropolitan Housing Authority ("CMHA")

Police Department were conducting a foot patrol in the Cedar Avenue CMHA housing project. The

_____

[*]The Honorable Bernice B. Donald, United States District Judge for the Western District of
Tennessee, sitting by designation.

officers noticed four men standing in a parking lot outside of one of the apartment buildings. As the officers approached and called out to the men, the men fled. The officers pursued two of the men who headed toward an apartment building. One of the men was wearing a gray sweatshirt, and the other was wearing a red polo. The men entered the building and the door locked behind them. As Williams tried to open the door, Svec stood back and watched the men climb the stairs through the illuminated stairwell windows. Svec was able to "see a hand with a gray sweatshirt come out the window and drop a weapon" onto a second-floor balcony, and then see the men enter a third-floor apartment. Another officer arrived on scene with a master key, but at about the same time the resident of the second floor apartment came down to let the officers in. Svec and the other officer proceeded to the second floor, where Svec entered the apartment with the balcony and recovered a loaded firearm from the balcony. Svec came back downstairs to secure the gun in his police vehicle, and then Williams and Svec entered the building and proceeded to the third-floor apartment. The two officers encountered the leaseholder to the apartment, Lorrie Lockhart ("Lockhart"), in the hallway. They asked and received her permission to enter the apartment. Inside, the officers found May in a gray sweatshirt, a juvenile in a red polo shirt, and a quantity of marijuana in the toilet that looked like it was about to be flushed.

The officers arrested both men, and May was indicted for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). May was tried before a jury and moved for a judgment of acquittal at the close of the Government's case, and again after closing arguments. The district court denied both motions. The jury ultimately found May guilty.

Prior to sentencing, the Probation Office prepared a Presentence Investigation Report ("PSR"). According to the PSR, Mays had a base offense level of 24, and a criminal history category of VI. Additionally, the PSR included a two-level enhancement under U.S.S.G. § 3C1.2 for reckless endangerment during flight based on May's having discarded a loaded weapon. May objected to the enhancement, but the district court denied the objection and applied the enhancement, creating a total offense level of 26. Accordingly, May's Sentencing Guidelines range was 120–150 months. However, because the statutory maximum sentence for a being a felon in possession of a firearm is 10 years' imprisonment, 120 months' imprisonment became the applicable Guidelines range pursuant to U.S.S.G. § 5G1.1(a). The district court imposed a 120-month prison sentence, and a $1,000 below the Guidelines fine. This appeal followed.

## II. Analysis

First, May challenges the jury verdict, arguing that there was insufficient evidence to link him to the discarded gun. Second, May challenges the sentence imposed, arguing that the two-level enhancement under U.S.S.G. § 3C1.2 was improper, and that the $1,000 fine was unreasonable. We will address these arguments in turn.

### A. The Sufficiency of the Evidence

We conduct *de novo* review of a district court's denial of a motion for acquittal for insufficiency of the evidence. *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010). "A defendant claiming insufficiency of the evidence bears a very heavy burden." *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006). "'The relevant question . . . is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Graham*,

622 F.3d at 448 (quoting *United States v. McAuliffe*, 490 F.3d 526, 537 (6th Cir. 2007)). In answering this question, we view "the evidence in 'a light most favorable to the prosecution, giving the prosecution the benefit of all reasonable inferences from the testimony.'" *Id.* (quoting *McCauliffe*, 490 F.3d at 537). "We afford the same weight to both circumstantial and direct evidence," *id.* (citation omitted), and "[c]ircumstantial evidence alone is sufficient to sustain a conviction," *United States v. Wettstain*, 618 F.3d 577, 583 (6th Cir. 2010). "We may not weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the jury." *Graham*, 622 F.3d at 448 (citation and internal quotation marks omitted). Challenges to witness credibility at this stage "'would invade the province of the jury as the sole finder of fact in a jury trial.'" *Id.* at 449 (quoting *United States v. Bearden*, 274 F.3d 1031, 1039 (6th Cir. 2001)). Indeed, an attack on witness credibility is not a proper challenge to the sufficiency of the evidence, but rather an improper challenge to the quality of the evidence. *See id.* (citation omitted).

We look first to the essential elements of the crime. "'To obtain a conviction pursuant to § 922(g)(1), the government must prove beyond a reasonable doubt: (1) that the defendant has a prior conviction for a crime punishable by imprisonment for a term exceeding one year; (2) that the defendant thereafter knowingly possessed the firearm and ammunition specified in the indictment; and (3) that the possession was in or affecting interstate commerce.'" *United States v. Schreane*, 331 F.3d 548, 560 (6th Cir. 2003) (quoting *United States v. Daniel*, 134 F.3d 1259, 1263 (6th Cir. 1998)). May only argues that the Government failed to prove the second element, because "there was no credible evidence" to link May to the gun that was recovered on the balcony. Specifically, May contends that the officers' testimony was inconsistent on several key issues: (1) whether both officers

initially pursued the two males; (2) whether Williams was present when the gun was discarded; and (3) whether the officers needed a key to gain access to Lockhart's apartment. Furthermore, May argues that the officers' testimony that they could see May drop the gun on the balcony, and see the men enter the third floor apartment was "patently incredible" because their views were obstructed.

The evidence that linked May to the firearm shows that both officers testified that they saw two men, one wearing a red shirt, and one wearing a gray shirt, run to and enter the apartment building. Svec's description was even more specific; he testified that one male was "anywhere between 5'8 to 5'10 tall, about 150 to 170," wearing a gray sweatshirt with blue jeans, and that the other male "had a red polo shirt on," and "was about 5'3, 5'4 . . . maybe about 120 pounds." R.60, Trial Tr., at 72–73. Both officers testified that they pursued the men to the apartment building, and Svec was able to watch the same men climb the stairs through the illuminated stairwell. As the men were climbing the stairwell, Svec testified that he saw the man in the gray shirt reach out of one of the stairwell windows and drop a firearm onto the balcony of a second floor apartment. Svec also testified that he was able to watch the men reach the third floor and enter an apartment notwithstanding the bars over the windows and the dirty glass. *Id*. at 75. The officers further testified that after recovering the firearm, they encountered Lockhart outside of the third-floor apartment. Svec testified that he asked her if two men ran into her apartment, to which Lockhart replied that two friends had recently come back from the store. *Id*. 78. The officers testified that after receiving permission from Lockhart to enter the apartment, and once they were inside, they found a male, who was about 5'3 and wearing a red polo shirt, in the living room. *Id*. at 25. Moreover, they saw May, who was about 5'9 and wearing a gray sweatshirt, leaving the bathroom.

Inside the bathroom, Svec testified that he found a "[l]arge amount of loose marijuana that was in the toilet that appeared to [be] ready to be flushed or discarded." *Id*. at 80.

As to merits of May's argument, May's challenges to the consistency of the officers' testimony are not well taken because they are improper challenges to the credibility of the officers and the quality of the evidence. *See Graham*, 622 F.3d at 449. Furthermore, even assuming for a moment that there were some inconsistencies with regard to some of the officers' testimony, we do not see how the inconsistencies noted by May affect the sufficiency of the evidence because there were no inconsistencies as to the officers' testimony on the key facts that linked May to the discarded firearm.

We may, however, consider May's argument that it was physically impossible for Svec to observe the two males climbing the stairs, and to see an arm with a gray sweatshirt drop a firearm on the balcony, because we do not "blindly accept implausible stories swallowed by the jurors" that are "beyond the realm of physical possibility." *United States v. Caraway*, 411 F.3d 679, 682–83 (6th Cir. 2005). May's defense counsel cross examined Svec on this issue, using photographs taken during daylight hours as exhibits. In particular, counsel used Exhibit NN, a photograph that according to Svec's testimony was taken from a vantage point that was at least close to where he was standing when he observed the men climbing the stairs. R.60, Trial Tr., at 90–91. In this photograph, despite some obstructions, we can clearly see an individual on the stairwell between the second and third floors. The photograph also leaves little doubt that it was possible to see someone reach an arm out the window to drop something on the balcony from this vantage point. Moreover, Svec testified that he believed his view was better at night because it was dark outside and the

stairwell was illuminated. R.60, Trial Tr., at 93. Thus, the evidence was more than sufficient for a reasonable jury to conclude that Svec: (1) saw the two males enter the apartment building; (2) saw the male with a gray sweatshirt drop a firearm out the second story window; and (3) watched the two males climb the stairwell to the third floor.

This leaves us with whether Svec could see the two males enter Lockhart's apartment. In this particular apartment building, once an individual reaches the third-floor landing there are three apartment doors—one to the left, one directly ahead, and one to the right—without a hallway. Because the building only had three stories, there were only three places the two males could have entered once they reached the landing. Svec testified that he had no problem seeing the individuals run into Lockhart's apartment. R.60, Trial Tr., at 107. The photograph that was taken from Svec's approximate vantage point does not provide us with what would have been Svec's view of the third floor windows, so it is irrelevant as to this question. Instead, May relies on photographs taken from the vantage point of an individual who is looking through the windows from the third-floor landing. But these photos are not helpful because, as Svec testified, they provide an entirely different line of sight. Thus, there is no evidence that would lead us to conclude definitively that it was "beyond the realm of physical possibility," *Caraway*, 411 F.3d at 683, for Svec to see which apartment the men entered when they reached the third-floor landing.

Furthermore, even assuming that Svec could not see which apartment the three men entered, there was strong evidence linking May to the gun, despite May's attempt to pile coincidence upon coincidence. When the officers encountered Lockhart on the landing, she told them that *two* men had recently entered her apartment. Perhaps, that was mere coincidence, but after Lockhart let the

officers inside, the officers encountered two men who fit the *exact* description of the two men that Svec watched climb the stairwell. It is possible, though doubtful, that in the middle of the night there were two other men in one of the other two apartments matching the same description, but the fact that May appeared to be flushing marijuana down the toilet—an act that provides a strong indication that May believed the officers were searching for him—removes any remaining doubt that May was the man who discarded the firearm.

In any event, viewing all of the evidence in the light most favorable to the government, a rational trier of fact could conclude that Svec saw May drop the firearm. It makes no difference that there was no physical evidence such as a fingerprint or DNA linking May to the gun, *see Graham*, 622 F.3d at 448, and even if Svec could not see which of the third-floor apartments the two males entered, "'[c]ircumstantial evidence alone is sufficient to sustain a conviction,'" *Wettstain*, 618 F.3d at 583. In short, May has not carried the heavy burden necessary to demonstrate that there was insufficient evidence to convict him, and we affirm the conviction.

**B. Sentencing Issues**

We review a district court's sentencing determinations for procedural and substantive reasonableness under the abuse of discretion standard. *See Gall v. United States*, 552 U.S. 38, 51 (2007). Furthermore, we accept the district court's factual findings unless they are clearly erroneous. *United States v. Moon*, 513 F.3d 527, 539 (6th Cir. 2008). "A factual finding is clearly erroneous when the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id*. at 540 (citation and internal quotation marks omitted). However, we conduct *de novo* review of the district court's legal conclusions. *Id*.

**1. The Enhancement for Reckless Endangerment**

Next, May argues that the district court erred by imposing a two-level enhancement for reckless endangerment during flight. Under the Guidelines, the enhancement is appropriate "[i]f the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." U.S.S.G. § 3C1.2. Thus, for the enhancement to apply, we have noted that the

> government must show that the defendant (1) recklessly, (2) created a substantial risk of death or serious bodily injury, (3) to another person, (4) in the course of fleeing from a law enforcement officer, (5) and that this conduct occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

*United States v. Woods*, 604 F.3d 286, 292–93 (6th Cir. 2010) (citation omitted). The Guidelines define "reckless" as conduct "in which the defendant was aware of the risk . . . and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." U.S.S.G. § 2A1.4 cmt. n.1; U.S.S.G. § 3C1.2 cmt. n.2. "'While the question of what constitutes endangerment is a mixed question of law and fact, it is highly fact-based. Therefore, significant deference to the district court is required.'" *Woods*, 604 F.3d at 293 (quoting *United States v. Hazelwood*, 398 F.3d 792, 796 (6th Cir. 2005)); *see also United States v. Wright*, 19 F. App'x 230, 233 (6th Cir. 2001) ("Whether a defendant engaged in reckless endangerment in the process of flight is a fact-specific inquiry reviewed for clear error.").

Here, the district court considered the applicability of the enhancement by first discussing whether the evidence presented supported the enhancement. The district court noted that the firearm was discarded in a housing project, "where children, teenagers or others are likely to be." Sent. Tr. at 9. Further, the court noted that there was at least one woman in the apartment connected to the balcony where the firearm was discarded, and that the woman entered the balcony after May tossed the firearm. *Id*. at 10. Thus, the court concluded**:**

> [W]here an individual discards a firearm in the vicinity of an apartment complex, where pedestrian traffic, I think we can make that finding by a preponderance of the evidence, that children and teenagers are likely to reside, that this creates a possibility that a child or teen or another individual, I don't think it matters if it's just children and teenagers as such, but where children and teenagers are likely to reside and may recover the weapon.
>
> In this case, we had a loaded firearm, and discarding a loaded firearm, like in the instant case, did recklessly create a substantial risk of death or serious bodily injury to another.

*Id*. at 11.

May argues that this enhancement is "typically—and most appropriately—applied in cases of high speed automobile chases in residential areas, physical altercations with officers involving weapons, and when discharging firearms while fleeing." Furthermore, May notes, there was no evidence that children or teenagers could have recovered the firearm, or that the firearm could have accidently discharged. Thus, May contends, it was clear error to conclude that discarding a firearm, which was quickly recovered, "onto a locked, second-story balcony of an apartment with a single resident," recklessly created a substantial risk of death or serious bodily injury to another. The Government responds that it is of no consequence that the firearm was quickly recovered because

such a recovery does not affect the conclusion that May's decision to discard the firearm was reckless. Further, the Government argues that the district court's finding that the firearm was discarded in a densely-populated area, creating a risk that someone else might recover the loaded firearm, was enough to support a finding that May recklessly created a substantial risk of death or serious bodily injury. Additionally, the Government contends that "the firearm could have discharged when it struck the concrete floor."

To begin, it would be inappropriate for us to uphold this enhancement based on the argument that May created a risk of the firearm discharging for two reasons. While we have upheld the application of this enhancement based on the risk created by a defendant who threw a cocked and loaded firearm, *see United States v. Howard*, 301 F. App'x 446, 448–49 (6th Cir. 2008) (noting that "[t]he risk [of discharge] created by throwing a cocked and loaded gun is obvious), the record does not indicate that the district court considered this as a basis for applying the enhancement. Furthermore, and unlike the firearm in *Howard*, there is no indication in the record that May's firearm was actually cocked when he tossed it onto the balcony.

Still, we cannot say that the district court committed reversible error in enhancing May's sentence. Certainly, it was reckless to discard a loaded firearm in a public-housing complex where it would likely be found by someone because such conduct is a "gross deviation from the standard of care that a reasonable person would exercise." Moreover, because it was possible that someone, whether an adult or child, would recover and discharge the firearm, May created a *risk* of death or serious bodily injury. The closer question is whether the risk was "substantial." Looking to our

cases, however, we have previously found "no persuasive argument to hold that the risk created by throwing a loaded gun near other people is not 'substantial,'" even when it is done "in front of police officers" and with no children present. *Howard*, 301 F. App'x at 449 (citing *United States v. Brown*, 314 F.3d 1216 (10th Cir. 2003)) (internal quotation marks omitted); *see also United States v. Allen*, 51 F.3d 273, 1995 WL 140837, at *4 (6th Cir. 1995) (unpublished) (holding that discarding a gun, whether loaded or unloaded in an area where it *could* easily be recovered was reckless endangerment). We are not alone. Other circuits have held that "simply leaving a loaded weapon in a public place" can warrant the enhancement. *United States v. Rogers*, No. 10-2849, 2011 WL 2144498, at *3 (7th Cir. June, 1, 2011) (unpublished) ("[H]e discarded a loaded revolver in a residential neighborhood at night, creating a substantial risk that someone would find it and get hurt."); *see also United States v. Lard*, 327 F.3d 551, 553 (7th Cir. 2003) (noting that discarding a weapon can amount to reckless endangerment when it is accessible by other people); *Brown*, 314 F.3d at 1221 (holding that discarding a loaded gun in an area with children and other bystanders constituted reckless endangerment); *United States v. Jefferson*, 58 F. App'x 8, 10 (4th Cir. 2003) (noting that discarding a loaded gun could constitute a substantial risk of injury to the community). Further, we have held that the fact that the weapon was quickly recovered by the police does not alter this calculus because the defendant still created "a risk that the weapon could be found or otherwise utilized by another individual." *Howard*, 301 F. App'x at 449; *see also Allen*, 1995 WL 140837, at *4 ("[T]he fact that the police retrieved the gun before [anyone else recovered it] did not erase the creation of a substantial risk.").

Here, the district court found that the loaded firearm was discarded in a place where *someone* could recover and discharge the weapon. May has not contradicted that factual finding. While May's conduct may not have been as severe as is typical for this enhancement, in light of these cases, and the significant deference that we afford to the district court's determination, we cannot say that the district court erred in concluding that May's conduct recklessly created a substantial risk of death or bodily harm. Accordingly, we affirm the district court's enhancement for reckless endangerment.

**2. The $1,000 Fine**

Next, May challenges the district court's imposition of a $1,000 fine. According to the Guidelines, the district court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). The Guidelines range for an offense level of 26 fine is $12,5000–$125,000. The defendant has the burden of demonstrating that he is unable to pay a fine, *United States v. Ukomadu*, 236 F.3d 333, 340 (6th Cir. 2001), and to determine if the defendant is able to pay, the district court must assess "(1) the defendant's income and earning capacity, (2) her financial resources, (3) the burden on the defendant and her dependents, (4) whether restitution is ordered and the amount of restitution, (5) the need to deprive the defendant of illegal gains, and (6) the need to promote respect for the law," *United States v. Jackson-Randolph*, 282 F.3d 369, 387 (6th Cir.2002) (citing 18 U.S.C. § 3572(a); U.S.S.G. § 5E1.2(d)). We review the district court's imposition of a fine for abuse of discretion, *United States v. Blackwell*, 459 F.3d 739, 770 (6th Cir. 2006). However, the district court's determination regarding the defendant's ability to pay a fine is a factual finding that is subject to

clear error review. *United States v. Stone*, 218 F. App'x 425, 439–440 (6th Cir. 2007) (citing *United States v. Hickey*, 917 F.2d 901, 906 (6th Cir. 1990)). Although we have yet to decide whether the district court must make explicit findings regarding the consideration of the factors outlined above, "we have indicated that detailed findings are not necessary where it can be inferred that the district court considered the defendant's ability to pay and other factors required by law." *United States v. Powell*, NO. 09-6177, 2011 WL 1930406, at *9 (6th Cir. May 20, 2011) (citing *United States v. Tosca*, 18 F.3d 1352, 1354–55 (6th Cir. 1994)).

May argues that the district court abused its discretion by: (1) failing to articulate a sufficient basis to impose a fine; (2) failing to adequately explain the basis for the amount of the fine; and (3) failing to justify the requirement that the fine be paid in a single lump sum. We see no reason to decide the question of whether a district court must make explicit findings on the record in imposing a fine because we think that May's arguments fail regardless.

The district court imposed the fine in this case immediately after discussing the applicable 18 U.S.C. § 3553(a) sentencing factors. The district court's § 3553(a) analysis included emphasis on May's "serious and significant record for an individual of [his] age," Sent. Tr., at 20, and the fact that many of the crimes on his record were committed either while he was on supervised release or immediately after release from prison, *id*. at 20–21. The district court emphasized that a strong punishment was necessary under the "totality of the circumstances . . . to meet the sentencing goals of punishment, deterrence and safety to the community." *Id*. at 22. Further, the district court stressed the need for May to take advantage of "treatment for substance abuse, and also educational and vocational training," because of May's lack of education and working experience. *Id*. at 21–22.

- 14 -

Immediately after imposing the maximum sentence allowed by law, the district court discussed the imposition of a fine:

> Although a fine is not recommended in this case because the defendant lacks the ability to pay a fine, and because of the length of the prison sentence, I think a non-guideline fine is appropriate. It is time for Mr. May to step up to the plate, and he can earn money through the Bureau of Prisons financial responsibility program. So the court is going to impose a fine of $1,000.
>
> Also, the defendant must pay a special assessment of $100, which is due and payable immediately. The fine is also due and payable immediately, but any amount that is not paid in full shall be part of his supervision.

Sent. Tr., at 23–24.

This record shows that the district court considered a number of factors in deciding to impose a fine. First, May's contention that "the district court did not demonstrate any consideration of Mr. May's financial capacity" is patently wrong because the district court clearly recognized that May lacked the ability to pay a fine within the Guidelines range. Further, the district court found that May would be able to pay a smaller amount, by earning money while in prison, and on supervised release. Considering May's ability to earn income in prison and upon release was not improper because "[c]urrent assets are not determinative of an ability to pay a fine." *United States v. Stone*, 218 F. App'x 425, 440 (6th Cir. 2007) (citing *United States v. Perez*, 871 F.2d 45, 48 (6th Cir. 1989)). Additionally, we can fairly infer that the district court imposed the fine to promote respect for the law and cause May to "step up to the plate" based on the court's discussion of May's criminal history, young age and need to develop skills. May has not identified any other *relevant* factors that the district court failed to discuss, and we see no issue with the district court's decision to require immediate payment of the fine, but to allow May to pay the fine over time if he is unable to do so.

In short, the indicia of the court's consideration of May's ability to pay the fine, and the reasons for imposing the fine, are sufficient to show that the district court did not abuse its discretion, "especially because [May] did not request more specific findings . . . or carry [his] burden of putting forth evidence that [he] would not be able to pay [his] fine under the term the court specified." *United States v. Woods*, 367 F. App'x 607, 614 (6th Cir. 2010) (citing *United States v. Tosca*, 18 F.3d 1352, 1355 (6th Cir. 1994)). Accordingly, we hold that the district court did not abuse its discretion in imposing a $1,000 fine.

### III. Conclusion

For these reasons, we **AFFIRM** May's conviction and the sentence imposed.