NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0081n.06

Nos. 12-6008, 12-6367

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jan 29, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellee, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF KENTUCKY |
| | ) | |
| DOUGLAS PATRICK HEALY, | ) | O P I N I O N |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE:  KEITH and McKEAGUE, Circuit Judges; and WATSON, District Judge.[*]

**McKEAGUE, Circuit Judge.**  Appellant Douglas Patrick Healy challenges the sentence imposed after he pleaded guilty to one count of wire fraud.  The district court sentenced Healy to a prison term of 57 months, ordered restitution in the amount of $918,866, ordered disgorgement of Healy's shares in Digital Storage Solutions, LLC, and imposed a $50,000 fine.  Healy asserts three claims of error, contending the district court (1) improperly calculated the monetary loss attributable to his crime; (2) erred in ordering restitution; and (3) erred in imposing a fine.  For the reasons that follow, we deny all three claims and affirm the judgment.

## I.  FACTUAL BACKGROUND

Barb and Max Smith, a retired couple from Kentucky, developed the idea for a wallet-sized card that could digitally store a person's medical information ("medical card").  When necessary,

---

[*]The Honorable Michael H. Watson, United States District Judge for the Southern District of Ohio, sitting by designation.

the medical card could be plugged into any computer so that doctors or paramedics could access the individual's medical information electronically. To develop and market their idea, the Smiths incorporated a company called KWS, LLC[1], contracted with local computer programmer Wendell Wilson to create the software for the medical card, identified a company to provide the hardware, and applied for a patent on both the medical card and its technology in 2007.

In 2008, the Smiths hired Healy and his company, Digital Storage Solutions, LLC ("DSS"), to market the medical cards. Healy was hired for a probationary period of employment, but when he failed to make any sales within ninety days, the Smiths declined to renew his contract. Nonetheless, Healy continued to covertly promote the medical cards as a way to raise capital for his company, DSS.

Healy conned investors into giving capital to DSS by telling them his company had the right to sell the medical cards. He represented that he developed the idea, hardware and software, and owned several patents on the technology. Healy also misrepresented the capabilities of the medical card, telling investors and potential clients it had features it did not have. He touted contracts for sales of medical cards that were nonexistent, including contracts with the Department of Defense and the Center for Rural Development. He told investors and clients that Wilson was the chief technology officer for DSS, held various degrees, and was a NASA scientist, all of which were untrue. Healy also lied about his own education and prior business experience and made misrepresentations as to why he was pardoned for a prior fraud conviction. Healy gave investors an equity interest in the company, but he retained approximately 50% ownership of DSS.

---

[1]The company was also alternatively called LifeNet Technologies, LLC, or VitalLife ID.

Healy's scheme worked as follows. Healy obtained money or capital from investors on the premise that he would market the medical card to large companies. He would then fly around the country and make sales pitches to companies. In the sales pitches, Healy would promise that the medical cards could do whatever the company wanted the cards to do, and he would say that DSS had whatever infrastructure the client needed. In truth, DSS did not have the rights to the software or hardware for the cards, the cards could not do everything he promised, and DSS did not have the necessary infrastructure to support larger clients. The sales pitches often impressed clients, but when clients asked to see a functioning card or wanted to close a contract for a purchase of cards, Healy would disappear for weeks at a time or falsely claim that he had cancer and could not attend the meeting.[2] Of course, the reason Healy could not close a sale was because the product. as represented, did not exist. Healy never actually completed a deal for a sale of medical cards. Nonetheless, he used the "business meetings" as a way of leading investors to believe a big sale was imminent and enticing them to contribute more to help close the deal.

Wilson eventually sued Healy, seeking a declaratory judgment as to the ownership of the intellectual property. The Smiths were joined as parties to the suit, and the parties settled the lawsuit in 2010. Healy received ownership of the technology and the Smiths received a note, signed by DSS and personally guaranteed by Healy, for $350,000.

Between January 2009 and September 2011, Healy raised and spent about $1.4 million of investors' money. He spent much of this money on trips for "business meetings," including trips

---

[2]Healy also lied to the Smiths about having cancer so that they would let him live with them. He even shaved his head so it would appear he was undergoing chemotherapy.

to Utah for meetings with two investors.  Healy opted for luxury hotels, rented expensive cars, booked airline tickets at the last minute, and dined at expensive restaurants during these "business trips."  He also spent almost a quarter of a million dollars traveling to Ghana to purportedly close a sale of medical cards to the Ghanaian government.  The deal appears to have been nonexistent, but investors were misled by a forged letter of intent.  Healy also spent investor money on trips to Italy and on diamond necklaces.

Notwithstanding the fraud, the advisory board of DSS elected to continue developing the medical cards in an attempt to make the company profitable under different leadership.  At the time of Healy's sentencing, DSS was a going concern and had entered into at least one legitimate contract for the sale of cards.

## II.  PROCEDURAL HISTORY

In October 2011, Healy was indicted on nineteen counts of wire fraud, in violation of 18 U.S.C. § 1343, and one count of securities fraud, in violation of 15 U.S.C. § 78j(b).  In February 2012, Healy pleaded guilty to one count of wire fraud.  For purposes of calculating Healy's specific offense characteristics under the Sentencing Guidelines, the government, Healy's counsel, and the probation officer who prepared the Presentence Report agreed to recommend using Healy's gain as the measure of loss, as discussed in U.S.S.G. § 2B1.1 cmt. n.3(B).

At sentencing, the district court rejected the recommendation and determined that the intended loss was the appropriate measure of loss under § 2B1.1.  The court calculated the intended loss to be $1.4 million, the total amount raised from investors.  The district court imposed a sentence of 57 months' imprisonment and a fine of $50,000.  It also ordered Healy to relinquish his ownership

interest in DSS as restitution. In a later hearing, the court found Healy's ownership interest to have no cognizable value at the time he disgorged it and ordered him to pay additional restitution to defrauded investors in the amount of $918,866.

## III. STANDARD OF REVIEW

Sentences imposed in the post-*Booker* era, are subject to review for procedural and substantive unreasonableness. *United States v. Haj-Hamed*, 549 F.3d 1020, 1023 (6th Cir. 2008). Both types of challenge are reviewed under the abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007). A sentence may be deemed procedurally unreasonable if the district court committed a "significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence . . . ." *Haj-Hamed*, 549 F.3d at 1023 (citing *Gall*, 552 U.S. at 51).

Healy contends only that his sentence is procedurally unreasonable, in three ways. First, he contends the district court improperly calculated the loss attributable to his crime. "[T]he district court is to determine the amount of loss [under U.S.S.G. § 2B1.1(b)(1)] by a preponderance of the evidence, and the district court's findings are not to be overturned unless they are clearly erroneous." *United States v. McCarty*, 628 F.3d 284, 290 (6th Cir. 2010) (quoting *United States v. Triana*, 468 F.3d 308, 321 (6th Cir. 2006)). To show clear error, a defendant must show the calculation "was not only inexact but outside the universe of acceptable computations." *United States v. Martinez*, 588 F.3d 301, 326 (6th Cir. 2009) (quoting *United States v. Raithatha*, 385 F.3d 1013, 1024 (6th Cir. 2004)). In calculating the loss, the district court need only make a reasonable estimate. *McCarty*,

628 F.3d at 290. "The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence." *Id.* (quoting U.S.S.G. § 2B1.1 cmt. n.3(C) (2008)). For this reason, the district court's loss determination is entitled to appropriate deference. *Id.* The court's determination as to whether the facts warrant application of a particular offense-level increase is reviewed de novo. *Blackwell*, 459 F.3d at 772.

Healy also challenges the restitution order. Whether imposition of restitution is permissible under the circumstances is reviewed de novo, but the amount of restitution is reviewed for abuse of discretion. *United States v. Boring*, 557 F.3d 707, 713 (6th Cir. 2009). "An abuse of discretion occurs when the reviewing court is left with the definite and firm conviction that the trial court committed a clear error of judgment." *United States v. Batti*, 631 F.3d 371, 379 (6th Cir. 2011).

Finally, Healy contends the fine imposed is procedurally unreasonable. The district court's imposition of a fine is reviewed for abuse of discretion. *Blackwell*, 459 F.3d at 770. The factual findings regarding a defendant's ability to pay a fine are reviewed for clear error. *United States v. Hickey*, 917 F.2d 901, 906 (6th Cir. 1990). If, however, the defendant failed to object to imposition of the fine at sentencing, we review only for plain error. *United States v. Lumbard*, 706 F.3d 716, 720 (6th Cir. 2013). "To establish plain error, a defendant must show (1) that an error occurred in the district court; (2) that the error was plain, i.e., obvious or clear; (3) that the error affected defendant's substantial rights; and (4) that this adverse impact seriously affected the fairness, integrity or public reputation of the judicial proceedings." *Blackwell*, 459 F.3d at 770 (quoting *United States v. Abboud*, 438 F.3d 554, 583 (6th Cir. 2006)).

**IV.  ANALYSIS**

**A.  Loss Calculation**

Healy makes several arguments regarding the district court's loss calculation.  First, he contends the district court erred in concluding that the intended loss, as opposed to his gain, was the appropriate measure of loss under U.S.S.G. § 2B1.1.  Next, Healy contends the district court made a clear error of fact in calculating the intended loss as the entire amount Healy obtained by fraud.  Specifically, he argues there was no evidence at sentencing that he intended to defraud investors from the inception of DSS, such that it was error to calculate the intended loss to be the entire $1.4 million raised from investors.  Finally, he contends the fact that he spent some of the investors' money on legitimate business expenses proves that the district court's finding was clearly erroneous.  Each of these arguments lacks merit.

**1.  *Use of Intended Loss***

Section 2B1.1 of the Sentencing Guidelines requires a sentencing court to increase a defendant's offense level based on the amount of monetary loss attributable to his crimes.  Loss is typically "the greater of actual loss or intended loss."  U.S.S.G. § 2B1.1 cmt. n.3(A).  "Actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense."  *Id*.  "Intended loss" is defined in relevant part as "the pecuniary harm that was intended to result from the offense."  *Id*.  Alternatively, a court may use the defendant's gain as the measure of loss, but "only if there is a loss but it reasonably cannot be determined."  *Id.*, cmt. n.3(B).  Courts have consistently preferred not to substitute the defendant's gain because it ordinarily underestimates the loss.  *United States v. Triana*, 468 F.3d 308, 323 (6th Cir. 2006).

Healy contends the district court erred in using intended loss as the appropriate measure of loss. Both parties recommended using Healy's gain as the appropriate measure of loss. However, the court was required to use either actual *or* intended loss where such loss could reasonably be determined. U.S.S.G. § 2B1.1 cmt. n.3(B). Because the district court was unable to reasonably determine the residual net value of DSS, and therefore could not reasonably determine the total actual loss, the court used intended loss as the measure of loss. As explained below, the record was sufficient to enable a reasonable determination of intended loss, obviating the need to resort to Healy's gain as the measure of loss.

### 2. *Calculation of Intended Loss*

Next, Healy argues the district court erred in its finding that he intended to defraud investors out of $1.4 million. He contends there was no evidence he intended to defraud his investors from the outset of DSS's involvement with the medical cards and no evidence as to when the fraud began or how much money had already been raised at that point.

On the contrary, the district court heard testimony at sentencing indicating Healy intended to defraud investors from the outset. For example, one of his investors, Jason Farr, testified that while courting Farr's initial investment, Healy lied about inventing the medical cards. Additionally, the preponderance of the evidence showed there was *never* a time when Healy solicited investments with the intent of honestly selling the medical cards. Farr testified that Healy would fly out to business meetings and make dazzling sales pitches but then disappear when the potential client wanted to close a deal. The district court found Farr's testimony credible and supported by recorded conversations of Healy. Special Agent Mark Coleman also testified that his investigation revealed

that Healy was not actively trying to sell the cards and that instead, his goal was to get investors' money and leave. Additionally, there was evidence that Healy never made a sale on behalf of DSS despite apparently having numerous eager clients.

Given the evidence presented at sentencing, the district court's finding that Healy never had any intention of selling the medical cards or building up DSS as a legitimate company was adequately supported. A preponderance of the evidence supported the court's finding that Healy's scheme was to travel to "business meetings," take investors' money by saying he needed it to secure contracts with the clients he just met with, and disappear before the client could close a deal or realize Healy could not sell the product as represented. Nor did the district court err in concluding that Healy operated according to that scheme from the outset. The testimony showed that Healy started making fraudulent misrepresentations when he began soliciting investments for DSS, telling investors he owned the hardware and software for the medical cards, though in reality it was still owned by the Smiths. Moreover, given that Healy never intended to sell the medical cards and completely fabricated imaginary capabilities of the cards and infrastructure of the company, the district court did not err in concluding that his plan was to continue defrauding investors until the investors lost their entire investment.

### 3. *Reduction for "Legitimate" Expenses*

Next, Healy argues the district court ignored two facts which should have lowered the intended loss for purposes of calculating his Guidelines range. He argues first that the investors have a valuable product which they would not have absent Healy's formation of DSS and solicitation of their investment. Healy also contends that much of the $1.4 million went toward

paying employees' salaries and other legitimate business expenses and was not entirely for personal gain. Both arguments fail.

As explained above, the court properly used intended loss in calculating the loss attributable to Healy's criminal conduct. Because the court determined that Healy intended to defraud his investors from the outset, the entire $1.4 million was properly included. Any residual value DSS had would have been relevant if the district court had used actual loss as the measure of loss, but it was irrelevant to the intended loss calculation. Likewise, any amount of investor money spent for business purposes would have been relevant to a calculation of Healy's personal gain, but it was irrelevant to the intended loss calculation. Neither DSS's current value nor the money spent on business expenses affects the finding that Healy intended to defraud his investors out of the entire $1.4 million.[3] That DSS may have had residual value simply shows that Healy's fraud was uncovered before the company was rendered irretrievably insolvent. That some of the investors' money was spent on employee compensation and other legitimate business expenses merely shows that investor money was used to lull investors into believing the company was legitimate and prolong the life of the fraudulent scheme. As such, none of the expenses can fairly be described as "legitimate." In sum, the district court did not clearly err in calculating Healy's intended loss to be the entire $1.4 million raised from investors.

---

[3]Healy argues that Chris Watson was one of his investors as well as an employee, so Healy could not have intended Watson to lose his entire investment if part of it was repaid to Watson as salary. Even if we were inclined to discount Watson's compensation (approximately $260,450), the intended loss would not have been low enough to result in a different advisory Guidelines range.

Finally, upon de novo review of the district court's application of U.S.S.G. § 2B1.1, we find that the record facts warrant a sixteen-level enhancement for a loss of $1.4 million. Accordingly, we find no error in the district court's use and calculation of intended loss for purposes of computing the Guidelines range.

## B. Restitution

The sentence included requirements that Healy relinquish all interest in ownership of DSS, disgorge his shares in DSS to the company, and pay restitution to defrauded investors in the amount of $918,866. For any offense committed by fraud, the court must order the defendant to make restitution to the victim of the offense in the full amount of the victim's loss. 18 U.S.C. § 3663A(a)(1), (c) and § 3664(f)(1)(A). Restitution shall be equal to the greater of the value of the property on the date of the damage, loss, or destruction or the value of the property on the date of sentencing, minus the value (as of the date it is returned) of any part of the property that is returned. 18 U.S.C. § 3663A(b)(1)(B). Unlike the loss calculation under U.S.S.G. § 2B1.1, which can be based on intended loss, the restitution calculation can only be based on actual loss. *United States v. Simpson*, 538 F.3d 459, 465–66 (6th Cir. 2008). The district court determines the amount of restitution by a preponderance of the evidence, and the government has the burden of establishing the amount of the loss. 18 U.S.C. § 3664(e).

Per 18 U.S.C. § 3663A(b)(1)(B)(ii), the restitution amount was computed by determining the amount the investors lost, $918,866, and reducing that amount by the value of the shares Healy disgorged to DSS. Healy has not challenged the district court's finding that the individual investor

victims' losses totaled $918,866.[4] This is the loss calculation and the amount of monetary restitution ordered in the amended judgment of sentence. Healy did not object to this calculation at sentencing and has not challenged it on appeal. We accept therefore that the government carried its burden of establishing the victims' actual loss by a preponderance of the evidence for purposes of determining the restitution amount.

Nor has Healy challenged the order included in the original judgment of sentence that required him to relinquish his ownership interest in DSS to make the company whole. Since Healy was ordered to return this property to the company in kind, there was no need to determine the value of his interest at that stage of the sentencing under 18 U.S.C. § 3663A(b)(1)(A). The district court later found, in the second sentencing hearing on October 23, 2012, that at the time Healy disgorged his shares, DSS had no cognizable value. The court therefore made no reduction for the value of Healy's shares at that time. The court ordered Healy to pay the full amount of the investors' loss in restitution. It is this order that Healy now challenges.

Healy has not argued that the loss amount, $916,866, should be reduced by the value of his interest returned to the company at the time of sentencing under 18 U.S.C. § 3663A(b)(1)(B)(ii). Healy's counsel acknowledged at that final sentencing hearing that the company may indeed have had no value at the time of sentencing. Counsel further observed that "it probably may never have value." R. 53, Sent. tr. at 11, Page ID # 582. Thus, again, Healy has not challenged the $918,866

---

[4]To determine the amount of loss for purposes of restitution, the government sent questionnaires to Healy's investors, asking if they considered themselves to be victims of his crime and whether they sought restitution. The sum total lost by investors who considered themselves victims and sought restitution was $918,866.

loss amount and has not challenged the district court's failure to reduce that amount based on the present value of his disgorged interest.

The district court's finding that DSS had no value at the time of sentencing is a finding of fact that can be disturbed only if shown to be clearly erroneous. To be clearly erroneous, "a decision must strike this Court as more than just maybe or probably wrong; it must strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." *United States v. Lanham*, 617 F.3d 873, 888 (6th Cir. 2010) (quoting *United States v. Perry*, 908 F.3d 56, 58 (6th Cir. 1990)). Far from showing that this finding by the district court was clearly erroneous, Healy has presented neither evidence nor argument challenging it.

Rather, Healy's counsel argued at sentencing—and this is the claim preserved for review—that the interest returned to the company *could* end up having value in the future, in which case the investor victims would realize an impermissible duplicate recovery as a result of the dual restitution requirements. Healy thus argued that *if* his interest in DSS that was "turned over to the company ends up having some value, [he] is entitled to an offset against any restitution order." R. 53, Sent. Tr. at 6, page ID # 577. He contended that the value should be determined (and the offset applied) at such time as the interest returned by Healy might be sold by the owners of the company; *then* its value could be ascertained. *Id.* at 12-13, 15, Page ID # 583-84, 586. Healy insisted that the judgment include a provision "for an offset," *id.* at 7, at such "time that there's some value to it," *id.* at 12, to the extent the individual investors might someday realize income or recoup money from the interest in DSS he had returned, *id.* at 15.

In response, counsel for the government and counsel for DSS argued at sentencing that *if* the value of the company increased in the future, such increase would not be derivative of any value Healy's interest had when it was disgorged, but would instead be attributable to the fact that Healy's name had been disassociated from DSS and to others' subsequent efforts to make the company profitable. *Id.* at 14, 16-17, Page ID # 585, 587-88. The government therefore argued that DSS should be deemed to have had no cognizable value at the time Healy disgorged his shares and that Healy was not entitled to any offset for his interest returned. The district court adopted the government's position.

The district court's finding that Healy's interest had no cognizable value was derivative of its determination that DSS had no cognizable value at the time of sentencing. R. 53, Sent. tr. at 23-25, Page ID # 594-96. The district court characterized the record evidence as "very clear." *Id.* at 24, Page ID # 595. The only thing of potential value was an "idea"—an idea that was created and developed by, and belonged to, someone else. *Id.* The district court explained that it ordered defendant Healy to relinquish his interest in DSS to the company as a form of restitution, as the only way to compensate victims and restore their loss, because "every additional day Patrick Healy retains his fraudulently obtained 50% interest in DSS—DSS and its investors and owners will continue [to] lose value and suffer as victims of Healy's fraud." R. 41, Opinion at 4, Page ID # 284. In other words, the district court ordered relinquishment or disgorgement of Healy's interest not because anything of currently ascertainable monetary value was being restored to the company, but because "DSS must cleanse itself of Healy's fraud to establish trust with potential investors and clients." *Id.* The court further explained its reasoning in the sentencing hearing:

> The defendant's criminal investigation, his fraud, had been exposed, was known to the public. The Court in ordering him to relinquish his association with the company and any interest that he might claim was to attempt to provide some ray of hope to investors who might want to try to further pursue this notion that they could keep the company alive.
> Most importantly, during the period of the defendant's fraud, this technology was growing old or stale. Other similar competing products are out there in the market everyday in this rapidly changing field. Therefore, the company lost value in a way that truly cannot be measured. They lost value in opportunity for technological advancement.
> So, I will find that at the time of sentencing the company's value was zero.

R. 53, Sent. tr. at 25, page ID # 596.

Healey contends the district court erred by finding his interest in DSS had no cognizable value and by refusing to make provision for potential offset in the future, creating a risk of double restitution. Healy's claim goes to a matter on which he had the burden of proof. *See United States v. Elson*, 577 F.3d 713, 733-34 (6th Cir. 2009). *Elson* makes it clear (1) that any offset stemming from compensation that may be received by the individual victims from other sources (e.g., income potentially realized in the future as a result of an eventual increase in the value of DSS) is to be handled separately as a potential credit against the restitution obligation of $918,866, not as a reduction in the amount of the obligation in the first instance; and (2) that the defendant bears the burden of proving entitlement to such an offset. As explained above, Healy clearly did not carry this burden at sentencing.

Furthermore, irrespective of which party had the burden, the evidence presented, though imprecise, *does* preponderate in favor of the district court's finding that DSS had no cognizable value at the time of sentencing. The district court relied on evidence that DSS: made no income during the time Healy was employed, Presentence Report ("PSR") at 74, Page ID # 376; still owed

almost $300,000 before it could gain full rights to the electronic storage card patent, R. 53, Sent. tr. at 34, Page ID # 412; had almost no cash because Healy spent $1,434,902.15 of the $1,439,022.53 raised in investor funds, *id*. at 122-40, Page ID # 500-18; owed more than $70,000 in legal fees, PSR at 69, Page ID # 371; and lacked cash to pay its bills and could not raise additional capital, R. 37, Sent. tr. at 15, Page ID # 239.

DSS did own some software for the medical cards and had a patent application for the intellectual property. In addition, a letter submitted on behalf of DSS on July 10, 2012, asserts that since Healy was removed from the company, new leadership "has been able to advance the technology to a point that it is finally marketable and has been able to secure contracts and generate sales." PSR at 69, Page ID # 371. Still, despite the fact that DSS may have had some *potential* value at the time of Healy's sentencing and its viability improved after Healy's departure, the record does not establish that the progress was enough to give the company net positive value at the time the district court ordered Healy to disgorge his interest, on October 24, 2012. R. 51, Amended Judgement, Page ID # 567.

We therefore find, on the record presented, that the district court's order of restitution has not been shown to be marked by clear error or abuse of discretion—especially considering the deference due the district court in making restitution determinations. Nor do we find error in the district court's conclusion that Healy is not entitled to credit for any future increase in the value of DSS because the increase would be attributable not to his but to others' efforts.

**C. Fine**

**1.** *Healy's Ability to Pay*

Finally, Healy contends that imposition of a $50,000 fine was procedurally unreasonable. Healy argues only in perfunctory manner that the district court erred in finding he had the ability to pay a fine.

"The court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). The burden of showing inability to pay rests on the defendant. *Id.*; *United States v. Lantz*, 443 F. App'x 135, 146 (6th Cir. 2011). "In determining whether and to what extent to impose a fine, the district court must consider not only the § 3553(a) factors, but also the fine-specific factors set forth in 18 U.S.C. §§ 3571 and 3572, and U.S.S.G. § 5E1.2(d)." *Lumbard*, 706 F.3d at 726 (quoting *United States v. Zakharia*, 418 F. App'x 414, 424 (6th Cir. 2011)). This requires the district court to assess: "(1) the defendant's income and earning capacity, (2) his financial resources, (3) the burden on the defendant and his dependents, (4) whether restitution is ordered and the amount of restitution, (5) the need to deprive the defendant of illegal gains, and (6) the need to promote respect for the law.'" *United States v. Jackson-Randolph*, 282 F.3d 369, 387 (6th Cir. 2002). The fact that a defendant is represented by assigned counsel is a significant indicator of present inability to pay a fine. In conjunction with other factors, [it] may also indicate that the defendant is not likely to become able to pay any fine." U.S.S.G. § 5E1.2 cmt. n.3.

The Presentence Report indicated Healy had a negative total net worth and recommended waiving the fine. The district court considered the PSR and also considered the fact that Healy had

a court-appointed attorney. In addition, Healy's attorney indicated Healy had no stock or money to pay a fine. This evidence indicates that at the time of sentencing, Healy had no present ability to pay a fine.

However, the district court was also required to consider Healy's future ability to pay a fine. U.S.S.G. § 5E1.2(a). To that end, the district court reviewed Healy's divorce papers prior to sentencing. It noted that as late as July 2012, Healy voluntarily incurred financial obligations on behalf of his minor child as part of his divorce settlement. Thus, the district court determined that this voluntary incurring of financial obligation indicated Healy did have some financial means. In addition, the district court was aware of Healy's employment history, attached to the PSR, which indicated he had steady employment since his teenage years.

Given this evidence, the district court did not clearly err in finding Healy was able to pay a fine. The evidence that Healy had appointed counsel is one indicator, but is not dispositive to show he was unable to pay a fine. *United States v. Londono-Mejia*, 86 F. App'x 825, 827 (6th Cir. 2004); *see also United States v. Blanchard*, 9 F.3d 22, 26 (6th Cir. 1993) (the standard for requiring the defendant to pay counsel out of his funds is different from the standard for imposing a fine). Healy's own assertion that he would have the means to provide financial assistance for his child is evidence that he expected to have assets in the future. This, combined with Healy's history of steady employment, lends support to the conclusion that Healy had future earning potential.

Other than his voluntary assumption of this future financial obligation, there was no evidence of Healy's future earning capacity or lack thereof. In the absence of proof by defendant on his likelihood of regaining his earning capacity, "the district court had the duty to impose some fine."

*Blanchard*, 9 F.3d at 26. Thus, the district court did not commit clear error in concluding that Healy failed to meet his burden of showing that he would not likely become able to pay a fine. *See United States v. Thomas*, 272 F. App'x 479, 490 (6th Cir. 2008) (concluding the district court did not clearly err in finding that defendant, who was unemployed prior to conviction, had numerous debts, and cared for numerous dependents, had ability to pay a fine); *United States v. Stone*, 218 F. App'x 425, 440 (6th Cir. 2007) ("Current assets are not determinative of an ability to pay a fine.").

### 2. *Fine-Specific Factors*

Healy next argues that, irrespective of his ability to pay a fine, the district court failed to consider the required 18 U.S.C. § 3572 factors before imposing the fine and instead only considered the divorce settlement's impact on his ability to pay.

Yet, detailed findings are not necessary where it can be inferred that the court considered the defendant's ability to pay and other factors required by law. *Lumbard*, 706 F.3d at 726. From the record at sentencing, we can infer that the district court adequately considered the fine-specific factors and therefore did not procedurally err in imposing a fine. As noted above, the record reflects the court's acknowledgment of Healy's income, earning capacity, and financial resources. The court also recognized the burden the fine would impose on Healy and any dependents, as it acknowledged the financial obligation Healy undertook for his minor child. The court considered restitution and properly ensured that the fine would not impair Healy's ability to make restitution by ordering that any money paid be dedicated first to restitution. *See Jackson-Randolph*, 282 F.3d at 387. That the court recognized the need to deprive Healy of illegally obtained gains is evidenced by the court's restitution order. Further, the court's consideration of the need to promote respect for the law in the

face of Healy's pattern of fraudulent behavior is implicit in the sentence.

In sum, the court's discussion at sentencing is sufficient, especially given that Healy did not object or request more specific findings. *United States v. May*, 430 F. App'x 520, 529 (6th Cir. 2011). As such, the district court did not procedurally err in imposing a fine.

## V. CONCLUSION

Accordingly, we find no error in the district court's use and calculation of intended loss, in its order of restitution, or in its imposition of a fine. The judgment is therefore **AFFIRMED**.

**WATSON, District Judge, dissenting.**

Healy perpetrated a complex fraud; thus, fixing restitution was a difficult task. The district court could have foregone restitution if determining the complex issues of fact would complicate the sentencing process such that the burden it imposed outweighed the need to provide restitution. 18 U.S.C. § 3663A(3). But, as the district court determined to impose restitution, it was required to do so in accordance with the statute.

I disagree with the majority on the restitution issue for three reasons: (1) the § 3663A(b)(1)(B)(ii) issue was preserved for appeal; (2) the government bore the burden of establishing the value of Healy's interest in DSS as part of the § 3663A(b)(1)(B) calculation; and (3) the district court abused its discretion when it valued Healy's interest in DSS in the absence of evidence quantifying DSS's assets, which included: ownership of the software for the medical cards, the patent application for the intellectual property, and at least one contract for the sale of cards. Therefore, I believe the district court's restitution order was entered in error and dissent.

## I.   The Section 3663A(b)(1)(B)(ii) Issue was Preserved for Appeal.

The majority states the only issue preserved for appeal is whether Healy is entitled to a future offset, but whether the district court properly valued Healy's interest in DSS pursuant to § 3663A(b)(1)(B)(ii) was also preserved for appeal.

First, the majority concedes § 3663A(b)(1)(B)(ii) required the district court to subtract from $918,866 the value of the shares Healy disgorged to DSS. *Supra*, at 11. Second, although Healy's appellate brief was less than clear, the government's brief recognized that this appeal involves a § 3663A(b)(1)(B)(ii) issue. Appellee Br. 26 (citing § 3663A(b)(1)(B) and stating the district court

"[a]ccordingly . . . subtracted zero from $918,866 and ordered Healy to pay $918,866 in restitution."). In fact, the government framed the appellate issue as whether the district court's factual finding that Healy's interest in DSS had no value when he surrendered it was clearly erroneous, in the context of § 3663A(b)(1)(B)(ii). *Id.* at 27.

Third, the majority is wrong to conclude that Healy's counsel argued at sentencing only for a future offset and that his concession that Healy's interest in the company may never have value negates the issue on appeal. Healy's counsel argued for a future offset[1] but also objected to the district court making *any* valuation of Healy's interest in DSS because it lacked sufficient evidence to do so. Oct. 23 Hr'g, PageID # 591–92, Case No. 5:11–cr–138, ECF No. 53 ("Mr. Taylor wants you to make an implicit order — an explicit finding here today based on no evidence whatsoever. . . . There is no finding here as to what the value of the company was on the date of sentencing or on the date of any of these hearings."). Moreover, Healy's counsel conceded during sentencing it is *possible* that Healy's shares had no value, but he repeatedly stated that the district court lacked evidence from which it could make that determination one way or the other, and he preserved that objection for appeal. *Id.* at PageID # 598 (objecting for the record); Appellant Br. 30, 33 (arguing "the court erred in ordering Healy to pay $918,866.00 in restitution . . . where the Court: . . . found that, contrary to its own prior order, DSS had no residual value; and . . . made this finding . . . without any evidence to support it.");[2] (arguing "the court erred in finding DSS had no residual value" and that such finding contradicted the evidence in the record that DSS "owned the rights to

---

[1] I agree with the majority's conclusion regarding future offset, which was not pursued on appeal.
[2] The original is in all capital letters.

a valuable asset.").[3] Thus, Healy properly preserved for appeal the issue of whether the district court erred in valuing Healy's shares in DSS during its restitution computation.

**II.     The Government Bore the Burden of Establishing the Value of Healy's Interest in DSS as Part of the § 3663A(b)(1)(B) Calculation.**

The district court "shall order restitution to each victim in the full amount of each victim's losses . . . ." 18 U.S.C. § 3664(f)(1)(A). The government bears the burden of proving the "amount of the loss sustained by a victim . . . ." 18 U.S.C. § 3664(e). The amount of loss for purposes of restitution is not simply the $918,866 that the victims invested in DSS. The full amount of loss is $918,866 *minus the value of the property that was returned (Healy's interest in DSS) at the time of sentencing.* 18 U.S.C. § 3663A(b)(1)(B)(ii). By finding that the only issue preserved for appeal was the issue of future offset, the majority misplaces the burden of proof on Healy. *Supra*, at 13, 15.

**III.    The District Court Abused Its Discretion When It Valued Healy's Interest in DSS Without Any Evidence Quantifying DSS's Assets.**

A thorough review of the record shows the district court lacked sufficient evidence to make any valuation of Healy's interest in DSS by a preponderance of the evidence. The record contained quantified evidence of DSS's liabilities but also contained evidence that, as of Healy's sentencing, DSS owned the software for the medical cards and the patent application for the intellectual property, was still a going concern, had been able to advance the medical cards to a marketable

---

[3] The majority also makes much of the fact that Healy did not challenge the order requiring him to relinquish his ownership interest in DSS as part of restitution. That is irrelevant. Although he agreed to disgorge his interest in the company as part of restitution, he argued the $918,866 initial loss amount should then be reduced by the value of that disgorged interest. Oct. 23 Hr'g, PageID # 591–92, Case No. 5:11–cr–138, ECF No. 53 (stating that if the Court will not allow future offset and intends to value Healy's interest in the company at $0, it should instead "[r]estore his 51 percent [interest], let him see if he can sell it to some investor out there and give the money back to the investors" because his interest had value).

format, and had generated at least one sale. The government, however, offered no evidence quantifying the value of the contract(s), the value of the software, the value of the patent application, or the value of DSS as a going concern.

On that record, any finding that DSS had no value was mere conjecture as the district court lacked a basis for finding that DSS's liabilities outweighed its assets. And the district court thus abused its discretion by making any valuation of DSS without enough evidence from which it could do so by a preponderance of the evidence.[4]

Accordingly, the sentence should be vacated and remanded, and the government should be given the opportunity to put on *some* evidence as to the value of DSS's contracts, patent application, and software at the time of disgorgement so that the district court can reliably find DSS's value by a preponderance of the evidence. For these reasons, I dissent.

---

[4] The majority states that the evidence preponderated in favor of finding a $0 value irrespective of who bore the burden of proof. *Supra*, at 15. But that statement ignores the fact that the record unequivocally showed DSS had some value but failed to show whether that value amounted to a net positive. Moreover, the majority's conclusion that the "record does not establish that the progress was enough to give the company net positive value at the time the district court ordered Healy to disgorge his interest . . . ." *supra*, at 16, is far from showing the value was $0 "irrespective of which party had the burden." It misplaces the burden on Healy and incorrectly concludes that because Healy failed to present evidence showing his interest *had* value, the record necessarily supported a finding that it did *not* have value.