NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 15a0442n.06

No. 14–5809

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Jun 12, 2015 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| | ) | |
| PAUL CHRISTOPHER TURNER, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

**BEFORE: SUTTON, GRIFFIN, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Defendant-Appellant Paul Christopher Turner appeals the below-guidelines, 96-month sentence and over $4 million in restitution imposed after he pleaded guilty, without a plea agreement, to one count of wire fraud and one count of aggravated identity theft.[1] Turner argues that his sentence is substantively and procedurally unreasonable because the district court found "an excessive amount of loss" and an "inflated number of victims." He also challenges the amount of restitution ordered and argues that the district court erred when it denied his motion for a third continuance. Finding no merit in these arguments, we AFFIRM.

**I.**

Turner owned and operated several companies that revolved around the "Avenging Apes of Africa" ("Apes"), a concept he developed in the early 1990s that involved a troupe of animated apes that travel the world and fight environmental problems and animal poaching. The companies, which were funded almost entirely through investments that Turner or his associates

---

[1] He does not appeal the statutorily mandated consecutive 24-month sentence for aggravated identity theft, which resulted in a total sentence of 120 months.

solicited, never realized a profit. Originally, Apes was a storyline developed for children's

cartoons; however, developing the cartoon became too costly, so Turner focused on producing a

one-hour-long DVD. The DVD was completed in 2004 or 2005 eventually Turner licensed the

rights to Los Angeles based MarVista Entertainment. Ultimately, the DVD was available for

purchase in 36 countries, but none of the investors recouped their investment.

In 2006, after realizing that the DVD was not going to be the international phenomenon

that he had hoped, Turner began plans to construct the "Go Go Gorillas! Fun Center" ("Fun

Center") in Danville, Kentucky. The Fun Center was supposed to compete with venues like

Chuck-E-Cheese's, and included an Apes-themed pizza cafeteria, children's games, a climbing

wall, and bowling. The Fun Center opened in December 2010 and enjoyed three to four months

of profits before it began operating at a loss. By March of 2011, the Fun Center's games and

rides were being repossessed, utility bills went unpaid, and Turner could not pay all of his

employees. By July 2012, the Fun Center was officially closed.[2]

About the same time that the Fun Center was being closed, one of Turner's investors

alerted law enforcement that she believed that Turner was misappropriating investment funds.

After an investigation substantiated the investor's claim, the United States ultimately indicted

Turner on five counts of wire fraud and one count of aggravated identity theft. On October 30,

2014, Turner pleaded guilty, without a plea agreement, to Count I (wire fraud) and Count VI

(aggravated identity theft) of the second-superseding indictment. The four remaining wire-fraud

counts (Counts II–V) were dismissed by the United States, but only after the parties confirmed

that in pleading guilty Turner was acknowledging responsibility for the entire scheme of

fraudulent activity spanning 2004 to 2013, not just the specific acts described in Count I, and the

---

[2] About the same time that the Fun Center was being closed for financial reasons, Turner met with a Chicago-based businessman to discuss opening a second (and perhaps third) Fun Center near Lexington, Kentucky. The instant criminal proceedings stopped the Lexington plan.

district court ensured that Turner understood that he was "having to admit to" "trying to accomplish something that is real fraudulent[]" by "misrepresent[ing]" the actual use of the investors' money throughout the entire scheme.

It is undisputed that Turner received approximately $389,000 in personal benefits from the scheme (*i.e.*, money to pay his mortgage, to lease expensive vehicles, to pay child support, etc.). It is also undisputed that during that same time period investors gave Turner at least $4.7 million. Finally, it is undisputed that Turner used some portion of the investors' funds on furthering the Apes concept.

Before sentencing, the district court was required to make a "loss determination"—a finding of how much "loss" was caused by Turner's fraud—and a number-of-victims determination—a finding of the number of persons or entities experiencing "actual loss"—in order to calculate the appropriate sentencing range under the Guidelines. At the two-day sentencing hearing, several witnesses established that Turner's fraudulent conduct permeated his companies' activities from 2004 until 2013. For example, witnesses testified that Turner sold unregistered stock certificates in one or more of the companies; that Turner obtained loans from individuals, sometimes for his own use and sometimes for the companies' use, and then paid the loans back with the stock; and that it was not uncommon for Turner to write checks from closed accounts or from accounts with insufficient funds. Moreover, Turner did not allow any of his employees or investors to see the companies' financial statements.

Specific instances of Turner's fraud were also introduced at the hearing. For instance, in 2006, Turner opened at least one, and possibly two, credit card accounts in another person's name without approval, and added additional card holders to a credit card account without the account holder's approval. In 2007, Turner exploited his relationship with an investor by:

obtaining at least four loans in the investor's name without approval, forging and cashing a $5,000 check in the investor's name, and leasing computer equipment in the investor's name without approval. Similarly, in 2008, Turner used an investor's investment of over $450,000 for unauthorized purposes: This money was supposed to purchase games for the Fun Center, but apparently was used for something else, as nearly all the games were repossessed within a few months of the Fun Center's opening. Moreover, Turner placed liens on this investor's home and restaurant, and admitted that he forged the investor's signature to do so. When the mortgage company questioned Turner, Turner lied in an apparent attempt to cover up his role in the fraud.

The United States also introduced the testimony of two forensic accountants who estimated the amount of money that Turner's companies received during the relevant time period, and offered conclusions based on their extensive investigation. One fraud inspector believed that "by the time the fun center began . . . there was fraud throughout th[e] entire investment scheme," and testified that Turner had developed a *modus operandi*: "Mr. Turner would start an entity, get into financial trouble, get sued, walk away from that company, start a new one, and repeat the pattern several times."

> After considering all of the exhibits and testimony, the district court explained that
>
> the question . . . is what's reasonably foreseeable pecuniary harm. And I think it is the case that engaging in the kind of widespread illegal activity and the corrupt business practices here, although there are a lot of very legitimate business practices as well, at some point it's reasonably foreseeable that the harm . . . that's going to occur will be ultimately the financial ruin of this particular company.
> . . .
> There are enough risks with legitimate business enterprises that we cannot allow fraudulent activities to undermine what is already an inherently risky endeavor. . . . So I think intuitively it seems a little troubling that there's a lot of really good effort here that we're lumping into a loss. *But we're lumping it into loss because that good effort was undermined by the illegal and fraudulent activity.* And so I [do not] think the government has to come in and dispute and say, Look, this wasn't a very good idea, and so that's fraudulent to be promoting

it in the first place, or this never had any potential, or that wasn't actually a pretty good strategy in terms of the business. . . . [T]hey can concede all of that and say the tragedy of this is these illegal activities brought all that good stuff crashing down.

The district court then determined that Turner's acts caused approximately $4.7 million of "actual loss"—the full investment amount raised from others—because Turner's fraudulent activity "undermined" his lawful efforts at establishing a successful business. This finding resulted in an 18-level increase. U.S.S.G. § 2B1.1(b)(1)(J) (applying to a "loss" between $2.5 million and $7 million). The district court also found that Turner's fraud affected 109 "victims," leading to a four-level increase.[3] U.S.S.G. § 2B1.1(b)(2)(B) (applying to a loss involving between 50 and 249 "victims").

## II.

We review criminal sentences for both substantive and procedural reasonableness. *Gall v. United States*, 552 U.S. 38, 51 (2007). "Reasonableness is determined under the deferential abuse-of-discretion standard." *United States v. Battaglia*, 624 F.3d 348, 350 (6th Cir. 2010). In determining procedural reasonableness, one factor we assess is "whether the district court properly calculated the Guidelines range." *Id.* at 350–51. If the district court misinterprets the Guidelines or miscalculates the Guidelines range, then the resulting sentence is procedurally unreasonable. *United States v. Bolds*, 511 F.3d 568, 579 (6th Cir. 2007). "The [district] court's legal interpretation of the Guidelines [is] reviewed de novo, but its factual findings are reviewed under the clearly erroneous standard." *Battaglia*, 624 F.3d at 351. The government bears the burden to "prove, by a preponderance of the evidence, that a particular sentencing enhancement applies." *United States v. Dupree*, 323 F.3d 480, 491 (6th Cir. 2003).

---

[3] Turner's challenge to the number of victims is derivative of his challenge to the loss amount. Put another way, Turner does not challenge that his fraud involved 109 victims if the district court's loss determination of "approximately $4.7 million" was correct; rather, he simply states that if the district court erred in its loss determination, it also erred in its number-of-victims determination.

Once we have determined that a sentence is procedurally sound, we must "then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *Gall*, 552 U.S. at 51. In reviewing for substantive reasonableness, we must "take into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Id.* For sentences within the Guidelines, we may apply a rebuttable presumption of substantive reasonableness. *Id.* In all cases we must "give due deference to the district court's decision," because the "sentencing judge is in a superior position to find facts and judge their import." *Id.*

## A.

We review a district court's loss determination for clear error, meaning that a defendant must show that the calculation "was not only inexact but outside the universe of acceptable computations." *United States v. Martinez*, 588 F.3d 301, 326 (6th Cir. 2009) (quotation marks omitted). Section 2B1.1(b)(1) of the Guidelines recommends imposing a sentence that considers the amount of "loss" caused by a defendant's fraud. U.S.S.G. § 2B1.1(b)(1). "Loss," for purposes of this section, "is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. 3(A).[4] "Actual Loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. 3(A)(i). When the loss resulting from a financial fraud is difficult to quantify, the district court need only make a "reasonable estimate of the loss" based on available information. U.S.S.G. § 2B1.1 cmt. 3(C). Such estimates "need not be determined with precision." *United States v. Rothwell*, 387 F.3d 579, 583 (6th Cir. 2004) (quotation marks omitted). In this context, the "sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence," and thus the district court's loss determination is due

---

[4] The district court did not make an "intended loss" finding, but for reference, "Intended Loss" is "the pecuniary harm that was intended to result from the offense . . . includ[ing] intended pecuniary harm that would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1 cmt. 3(A)(ii).

"appropriate deference." *United States v. McCarty*, 628 F.3d 284, 290 (6th Cir. 2010) (internal quotation marks and citations omitted).

The loss must be "caused" by the defendant's fraud. *Rothwell*, 387 F.3d at 583. "Causation includes two distinct principles, cause in fact, or what is commonly known as 'but for' causation, and legal causation." *Id.* (quoting *Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69, 73 (3d Cir. 1996)). Although "the former is always a necessary condition of causation which often is easily satisfied, the ultimate question is whether the cause in fact is legally sufficient 'to warrant imposing liability upon the actor.'" *Id.* (quoting *Farwell v. Un*, 902 F.2d 282, 290 (4th Cir. 1990)).

The district court did not clearly err when it determined that fraud permeated the entire investment enterprise, and that the actual loss from Turner's fraud was more than $2.5 million but less than $7 million (approximately $4.7 million). Given the extent and regularity of Turner's criminal wrongdoing (*i.e.*, opening lines of credit in others' names as early as 2006, forging documents, selling illegal securities, etc.), his companies were inevitably going to fail *because* of his conduct. Moreover, Turner did not propose an alternative loss amount; rather, he maintained that the fraud and poor bookkeeping rendered it impossible to "reasonably estimate" the loss, and thus that he should only be accountable for the $389,000 he admits he used for his personal benefit. The district court rejected this argument, and for good reason, as this method of calculating loss "is not the preferred method because it ordinarily *underestimates* the loss." *United States v. Triana*, 468 F.3d 308, 323 (6th Cir. 2006) (internal quotations and citations omitted). Thus, we cannot say that the district court's loss determination was "outside the universe of acceptable computations." *See Martinez*, 588 F.3d at 326 (internal quotation marks omitted).

**B.**

This finding is in accord with our past decisions. For example, in *United States v. Healy*, Healy promoted a product he was not authorized to sell in order to raise capital for his company. 553 F. App'x 560, 562 (6th Cir. 2014). Healy "conned" investors by misrepresenting his role in creating the product, the product's capabilities, and the product's market success. *Id.* Healy solicited investments and then used that money to find more investors; when a client asked to see the functioning product or wanted to buy the product, Healy disappeared or lied to the investor "because the product, as represented, did not exist." *Id.* at 563. We summarized Healy's plan: "[Healy] used the 'business meetings' as a way of leading investors to believe a big sale was imminent and enticing them to contribute more to help close the deal." *Id.* Healy raised and spent approximately $1.4 million in this scheme. For the "loss determination," the district court calculated the loss to be "the total amount raised from investors," as opposed to the amount Healy used for his personal benefit.[5] *Id.* On appeal, we affirmed, finding that a "preponderance of the evidence" supported the district court's finding, specifically noting that the district court did not "err in concluding that Healy operated according to th[e] scheme from the outset" because he "started making fraudulent misrepresentations when he began soliciting investments" for his company. *Id.* at 566. Thus, the district court properly relied on *Healy* when making its loss determination.

Similarly, in *United States v. Washington*, Washington was found guilty of submitting fraudulent invoices to the Detroit Public School system. 715 F.3d 975, 976 (6th Cir. 2013). Washington was supposed to create a wellness program for the school system and completed some legitimate work for the program (*i.e.*, she had circulated various flyers, had supplied

---

[5] The United States, Healy's counsel, and the probation officer all had agreed to quantify the loss using Healy's benefit, as discussed in § 2B1.1 cmt. 3(B).

pedometers, etc.). *Id*. at 978. At trial and at sentencing, Washington argued that because she had performed legitimate work, the entire $3.2 million she had received should not be considered "loss." *Id*. at 984. Nevertheless, the district court found that Washington caused between $2.5 million to $7 million in loss. *Id*. On appeal, we affirmed and stated that the district court would have been "justified in finding the amount of loss to be the entire $3.32 million because it found that the entire wellness program was a sham." *Id*. at 985. This is the case here as well.

*Rothwell*, cited by Turner, does not lead to a different conclusion. 387 F.3d at 584. *Rothwell* simply makes clear that a defendant must "cause" the amount of loss. Rothwell applied for and was granted a loan from the Small Business Administration ("SBA") to rebuild a building that had been destroyed in a storm. *Id*. at 581. He "fraudulently obtain[ed] one or more progress payments in [the] otherwise legitimate loan transaction," by using some of the loan proceeds to construct a building on an adjacent lot. *Id*. at 584. Rothwell made 23 monthly installation payments on the loan, but eventually "defaulted on the loan when he was unable to find tenants for the building." *Id*. at 581. The district court found that Rothwell had caused an "actual loss" of approximately $100,000 (the amount of the default) because of the fraudulently obtained progress payments. We reversed, holding that these isolated events "cannot reasonably be considered to have caused" the loss because "[t]here myriad explanations for the default—an unsound business risk, a poor economy, excess [comparable] space in the local market, or developments in unrelated transactions affecting Rothwell's ability to repay the SBA loan—all of which are more likely causes than the fraud-induced progress payment." *Id*. at 584. Here, however, the district court found that Turner's actions "undermined" the entire investment scheme, and thus any chance the companies had of succeeding was thwarted by Turner's actions. Thus, Turner's actions can "reasonably be considered to have caused" the investors' loss. *See id*.

In sum, the record and our past decisions adequately support the district court's loss-amount and number-of-victims determinations in this case. Turner does not challenge the district court's application of its findings to the Guidelines calculations itself.[6]

### III.

Turner next challenges the amount of restitution that the district court ordered. We review *de novo* whether restitution is permitted under the law, and review the amount of a restitution award for an abuse of discretion. *United States v. Boring*, 557 F.3d 707, 713 (6th Cir. 2009). Under the Mandatory Victims Restitution Act, defendants who commit certain crimes involving fraud must make restitution to their victims, 18 U.S.C. § 3663A, and the restitution order must be "based on the amount of loss *actually caused* by the defendant's offense." *Boring*, 557 F.3d at 713; *United States v. Finkley*, 324 F.3d 401, 404 (6th Cir. 2003). Because the district court did not err in determining that the actual loss was $4,761,106.28, it did not abuse its discretion in ordering restitution in the same amount. We affirm the restitution order.

### IV.

Finally, Turner appeals the district court's denial of his motion for a third continuance. Turner argues that he needed additional time to review all the documents seized during the investigation, which included multiple pallets of documents that were stored in a government warehouse. Turner had previously received two continuances to review these documents. After obtaining the continuances, he apparently did not schedule times to review the documents (he had to have an appointment to enter the warehouse), even after the United States reminded him that trial was approaching. In his motion for the third continuance, Turner requested "eight (8) full days to complete discovery and review of the remaining material." Turner's motion was

---

[6] A loss of between $2.5 million and $7 million results in an 18-level increase, U.S.S.G. § 2B1.1(b)(1)(J), and a "loss" affecting 50 to 249 victims results in a four-level increase, U.S.S.G. § 2B1.1(b)(2)(B). Thus, the district court correctly interpreted and applied the Guidelines to the facts.

filed on October 22, 2013, and trial was not set to begin until November 4, 2013—over "eight full days" away. Assuming Turner had acted diligently, he had all the time he stated he needed to review the discovery.

Turner also argues that the second superseding indictment "enlarged the time frame of the alleged scheme by several years and by millions of dollars of supposed losses to various entities and individuals." This argument fails; the United States filed a superseding indictment on August 1, 2013, but apparently some pages of the indictment were not included in the filing. The United States emailed the full indictment to Turner's attorney on or around August 1, 2013. Thus, on September 13, 2013, when the United States filed a second superseding indictment, it was in actuality the full superseding indictment that was filed on August 1. Turner had the exact same indictment, which included an identical time frame, since the beginning of August.

In any event, "a voluntary and unconditional guilty plea bars any subsequent non-jurisdictional attack on the conviction." *United States v. Corp*, 668 F.3d 379, 384 (6th Cir. 2012) (internal quotation marks omitted). Turner pleaded guilty without a plea agreement, and without a "court-approved reservation of issues for appeal." *Id*. (internal quotation marks omitted). Thus, Turner has waived his appeal of the district court's denial of his third continuance.

**V.**

For the foregoing reasons, we AFFIRM.