NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0619n.06

Case No. 15-4070

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Nov 21, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE SOUTHERN DISTRICT OF |
| THOMAS JACKSON, | ) | OHIO |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | OPINION |
| | ) | |

**BEFORE: GRIFFIN, WHITE, and DONALD, Circuit Judges.**

**BERNICE BOUIE DONALD, Circuit Judge.** A federal jury convicted Thomas Jackson of wire fraud, money laundering, and conspiracy to commit wire fraud and money laundering. Jackson's applicable Guidelines range was 97–121 months, based on an offense level of 30 and a criminal history category of I, but the district court sentenced him below that range, to a prison term of eighty-three months. On appeal, Jackson challenges the effectiveness of his trial counsel, the procedural and substantive reasonableness of his sentence, and the district court's failure to provide him with substitute court-appointed counsel. For the reasons that follow, we **AFFIRM** Jackson's convictions and sentence.

I.       BACKGROUND

Jackson and his business partner, Preston Harrison ("Harrison"), founded Imperial Integrative Health and Research Development, LLC ("Imperial") to develop and market a sports beverage called "OXYwater."  Jackson was the founder and CEO of Imperial, while Harrison was the president and founder.  In 2010, Jackson and Harrison began looking for investors for OXYwater.  Toward the beginning of their search for investors, Jackson and Harrison met with Robert Smith ("Smith"), who at the time owned a consulting company called Investors Capital Edge.  Smith's job involved consulting with clients on how to build proper business plans, corporate credit, etcetera.  During the initial meeting with Smith, Jackson told Smith that OXYwater was oxygen-enhanced, and that their goal was to raise about $8.5 million in capital. Jackson and Harrison initially contracted with Smith for him to perform consulting services for Imperial and OXYwater.  Upon joining Imperial, Smith suggested that they increase the start-up amount to $9.5 million and recommended other changes to the Private Placement Memorandum ("PPM")—the document that provided the overview of Imperial, how funds would be raised, and how much each share would cost.  Smith subsequently took on the more formal role of Chief Financial Officer of Imperial, where his focus was primarily on recruiting investors for OXYwater.

The PPM, which was given to a number of Imperial's investors, contained false information.  The PPM listed as National Sales Manager Daniel Couts, a former employee of Coke and Vitaminwater, and also listed Kevin Waddle, Michael Skelton, and Matthew Godsey, all former Coke and Vitaminwater employees, as members of the OXYwater sales team, and included their resumes.  None of these individuals, however, were ever employed by or associated with Imperial.  The PPM further included a section on celebrity endorsements that

listed OXYwater's official endorsers as well-known athletes, Manny Pacquiao and Gregory Jennings. These athletes were never officially affiliated with OXYwater or Imperial. Even further, the PPM indicated that in the first year, Jackson would receive a salary of $90,000 and Harrison a salary of $60,000. These numbers were subject to increase in subsequent years. Contrary to these representations, Jackson and Harrison were never officially on Imperial's payroll. Rather, Jackson used the Imperial accounts for his personal use, funneling significantly higher amounts than disclosed in the PPM to himself and Harrison. Finally, the PPM stated that the funds raised would be used for marketing, inventory, payroll, office warehouse lease, and to purchase machinery and commercial vehicles for local delivery to retail accounts. While some of the funds were used for legitimate business purposes, bank records indicated that the invested funds were also used by Jackson and Harrison for personal expenses. Based on the misrepresentations in the PPM and other oral communications, Jackson and Harrison received approximately $9.3 million in investments for Imperial and OXYwater.

In 2011, Jackson—who controlled all of Imperial's finances—transferred over one million dollars from Imperial accounts into an account listed under the name of ForeverNow, LLC ("Forever Now"). Forever Now listed Harrison and his wife, Lovena, as the only signatories to the account. The Harrisons used the Forever Now account as their personal account, purchasing personal items and paying for home improvement projects out of the account.

Following a joint investigation by the Federal Bureau of Investigation and the Internal Revenue Service, a federal grand jury, in May 2014, returned an indictment against Jackson and Harrison on various counts of wire fraud and money laundering. The grand jury also indicted

Preston and Lovena Harrison for tax fraud and tax fraud conspiracy, and indicted Lovena for structuring currency transactions to evade reporting requirements.

Jackson was tried in an eight-day joint trial with co-defendants Preston and Lovena Harrison. In its case in chief, the prosecution presented evidence from twenty witnesses, including six investor victims. Following the prosecution's case, the defense rested without presenting any proof. The jury convicted Jackson of one count of wire fraud conspiracy, in violation of 18 U.S.C. § 1349; eight counts of wire fraud, in violation of 18 U.S.C. § 1343; one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); and twelve counts of money laundering, in violation of 18 U.S.C. § 1957. The district court sentenced him to eighty-three months in prison and ordered restitution in the amount of $8,840,706.

## II.     APPOINTMENT OF NEW COUNSEL

Jackson first argues that the district court erred in denying his motion for a new court-appointed attorney, effectively forcing him to be represented by a lawyer with whom he had a conflict. For the reasons below, we hold that the district court properly denied Jackson's motion.

## A.  FACTS

On the first day of Jackson's trial, counsel for co-defendant Harrison, Mr. Gatterdam, informed the district court that they had just learned that Jackson had filed a disciplinary complaint against his counsel, Ms. Menashe, and that Jackson did not want to proceed with her as counsel. Ms. Menashe stated that she had not received a copy of the complaint, and that she had no prior knowledge of it. In response to questions from the court, Jackson stated that while he had only filed the disciplinary complaint approximately a week before, he felt like he had not had adequate counsel from the start. Jackson stated that there was a lack of communication between him and Ms. Menashe and that he had lost trust in her. Particularly, Jackson stated that

he believed Ms. Menashe thought that he was guilty because of the way she spoke to him, that she was refusing to investigate and introduce financial information that would give him "credibility in terms of the company financials," and that he thought she was working with the prosecution against him because of a plea agreement that she presented him within a week of his arraignment.

Upon inquiry by the court, Ms. Menashe stated that while she received a plea offer early on in the case, it was not within a week of the arraignment, and that it was submitted so early because the AUSA assigned to the case at the time was leaving the office and there were time constraints. Ms. Menashe also stated that she has an "aggressive personality" and that while she tends to not use the most flowery language, she had never told Jackson that she was "going to nail his butt." With respect to the breakdown in communication, Ms. Menashe stated that while verbal communication had slowed down, she had exchanged voluminous emails with Jackson, Harrison, and Mr. Gatterdam. According to Ms. Menashe, she would have liked to discuss with Jackson certain documents produced by the prosecution and whether he should testify, but in the past week Jackson had skipped a planned meeting and stopped returning her calls. Regardless, Ms. Menashe stated that there was ample time to do those things before the defense would have to present its case, and that she believed she was prepared to go forward with trial despite the communication issues. Finally, Ms. Menashe stated that with regards to the ledgers and financial documents that Jackson referred to, she did not believe that she could ethically introduce those documents because she could not properly authenticate them.

Mr. Gatterdam, Harrison's lawyer, also spoke to the court. Importantly, he noted that he too had concerns with introducing the ledgers, which were supposedly prepared by Mr. Kevin Foster, who at one point was going to be considered an unindicted co-conspirator, and who was

also a named defendant in a related civil suit. Mr. Gatterdam also noted that he had been in meetings with Ms. Menashe and the defendants, and while she was direct, he did not believe that she had ever been unprofessional.

The court also heard from the prosecution that it had "devoted tremendous resources to getting this case ready to go today" and that the prosecution believed that Jackson's complaint was a ploy to not go forward at that time. Following the prosecution's statement, the district court made the following findings:

> Well, as many cases have stated in the past in Court of Appeals decisions, the right to counsel of choice, unlike the right to counsel, is not absolute. And the [c]ourt generally goes through several considerations when this issue arises. And the first one is the timeliness of any motion or request. And this comes the morning of trial. The timeliness of this is, first of all, dilatory and, second of all, suspect.
>
> From, or, with regard to what it is that the defendants are complaining of, well, my notes indicate that they believe they're, whatever this means, underrepresented or they believe that their attorneys believed that they were guilty from the start; there was this issue concerning plea agreements; that there have been harsh words as far as dialogue between counsel and the defendants are concerned. They indicate – defendants indicate that communication has broken down, that there has been a lack of investigation. And then there is this issue of financial ledgers. That seems to encapsulate that which the defendants are complaining of here this morning.
>
> First of all, with regard to the defendants feeling guilty – feeling that their attorneys believe they were guilty from the start, that's not an unusual position for defendants to find themselves in when they discuss matters with their counsel. In fact, I'd be surprised if many times that doesn't happen simply because counsel has to be critical with regard to the presentation of their case to make sure that they don't fall into a trap.
>
> With regard to the plea agreements, well – yeah. I'm glad to know that counsel has presented the plea agreements as they come along to counsel, or, to the defendants. The fact that those plea agreements were not accepted kind of speaks to itself, but the bigger problem I've had in the past is when plea agreements and negotiations from the government to defense counsel have not been forwarded to the defendants. And that's not the case here. In fact, I don't see any issue here with regard to these plea agreements being presented to the defendants.

On the other hand, I find that they have – the defense counsel has tried to get these to counsel and to the defendants in a timely manner because they were under a deadline, apparently to get an answer.

With regard to the dialogue between the defendants and counsel, I'm familiar with all three counsel, all three defense counsel. I'm very familiar with Ms. Menashe and Mr. Gatterdam's representation of clients not only in the state court proceedings but in federal court proceedings. I have had them appear before me, for probably the last 15 years, in different cases, including murder cases.

I consider the two of them, [Ms.] Menashe and Mr. Gatterdam, to be two of the best criminal attorneys, defense attorneys, in central Ohio. I have noticed in the past, but I don't find this to be a criticism, that they are very blunt with regard to their representation of the defendants because they have to be. And whether the defendants like that dialogue or not is of little consequence here today.

Let me just say defense counsel are not – are not to be lackeys for the defendants.

With regard to the breakdown in communication, I find this to be almost laughable. The breakdown of the communication has been self imposed [sic]. The defendants, themselves, have stopped talking to the defense counsel. I don't see that as a problem here. I mean, I see that as a problem, but it's not a problem of counsel.

There seems to be this whole issue of corporate financial ledgers. I will say, just for the defendants' sake, there are issues involved with regard to evidentiary matters. And I'm not sure what these ledgers are or what we're referring to, but I trust defense counsel when they tell me that there are issues in their mind with regard to the presentation of these corporate financial ledgers. They are schooled and trained in the rules of evidence. The defendants are not.

So, I have tried to go through each of these complaints, if you want to call them that, that the defendants have made; and I don't see where this is a problem of defense counsel. I think there is more of an issue here involving the self-imposed communication breakdown that the defendants have created. And I would suggest that they begin to communicate with their counsel in this matter.

I have to balance the public's interest in a prompt and efficient administration of justice. And that balance tips in favor of not granting any request of the defendants for new counsel at this time.

As Mr. Young [counsel for the government] has stated, you have witnesses coming in from all over the United States. The parties have worked hard, and that includes the defense counsel. I'm aware of that because I have reviewed their exhibit books, their witness lists and so forth, and I understand that

they have met on several occasions with the government to discuss evidentiary issues and try to resolve some of those.

But what I'm getting at is, we're set for trial today. We have prospective jurors, many more than I normally have, ready to go here. And we have witnesses coming in and matters lined up for the next two weeks. I have to balance that against the defendants' what appears to be a right to counsel of choice, and the balance tips quickly and convincingly on behalf of proceeding here today.

The request, if that's what this is, and I believe it is – the request of the defendants for a continuance to obtain new counsel is denied.

(R. 139, PageID # 3522–26.)

## B. ANALYSIS

We review a district court's denial of a motion to substitute counsel for abuse of discretion. *United States v. Marrero*, 651 F.3d 453, 464 (6th Cir. 2011) (citing *United States v. Mooneyham*, 473 F.3d 280, 291 (6th Cir. 2007)). The Court will consider the following four factors to determine if a reversal is warranted:

(1) the timeliness of the motion, (2) the adequacy of the court's inquiry into the matter, (3) the extent of the conflict between the attorney and client and whether it was so great that it resulted in a total lack of communication preventing an adequate defense, and (4) the balancing of these factors with the public's interest in prompt and efficient administration of justice.

*United States v. Trujillo*, 376 F.3d 593, 606 (6th Cir. 2004) (quoting *United States v. Mack*, 258 F.3d 548, 556 (6th Cir. 2001)).

All four factors weigh heavily against Jackson and in favor of the district court's decision to deny substitution of counsel. First, timeliness: Jackson filed his disciplinary complaint against counsel approximately a week before the first day of trial. However, he did not inform the court or his counsel about this complaint. Instead, Jackson waited until the day of trial to inform the court that he wanted substitute counsel. This Court has repeatedly upheld the finding of untimeliness in cases involving longer periods than is present here. *See, e.g., Trujillo*, 376 F.3d at 606–07 (finding that a motion for substitution of counsel filed three days before the start of

trial was untimely); *United States v. Williams*, 176 F.3d 301, 314 (6th Cir. 1999) (upholding a finding of untimeliness where the defendant requested new counsel two weeks before trial); *United States v. Jennings*, 83 F.3d 145, 148 (6th Cir. 1996) (concluding that a motion for substitution of counsel, filed the day before trial, was untimely). Jackson attempts to justify the delay in requesting substitute counsel by stating that he did not know until the eve of trial that his lack of communication with his attorney would have an unfavorable impact on his case. (Appellant Br., at 46.) This argument is unpersuasive for two reasons: (1) Jackson informed the district court that he felt like he had not had adequate counsel from the start; and (2) even after filing the disciplinary complaint, Jackson still waited over a week to inform the court of his dissatisfaction with counsel. Despite appellate counsel's laudable attempt at oral argument to minimalize the failure to satisfy this factor, it is clear that the district court did not abuse its discretion in finding that the motion was untimely.

Second, the Court looks at the adequacy of the district court's inquiry into the matter. "[T]o meet this requirement, the district court simply must allow a defendant the opportunity to explain the attorney-client conflict as he perceives it." *Marrero*, 651 F.3d at 465 (citing *United States v. Vasquez*, 560 F.3d 461, 467 (6th Cir. 2009)). The record indicates that the district court engaged in a lengthy discussion with Jackson and gave him the opportunity to detail the alleged conflict between him and his attorney and his concerns with her representation of him. The district court also heard from Jackson's attorney, co-defendant Harrison, and Harrison's attorney. During these exchanges, Jackson was given the opportunity to air his grievances and counsel was given an opportunity to respond. It appears from the record before the Court that the district court satisfied its obligation to inquire into Jackson's complaint.

The Court next looks at the nature of the conflict between the attorney and the client. Jackson listed, as reasons for his dissatisfaction with counsel, lack of communication and trust stemming from his belief that his counsel thought he was guilty, her use of harsh words to him, her presentation of a plea agreement to him early on in the case, and her refusal to introduce evidence at trial that he wanted her to. The district court addressed each of defendant's complaints, finding it was not unusual for defendants to feel like their lawyers believe they are guilty; that because defense counsel are not supposed to be lackeys for defendants, counsel's blunt nature is not a reason for substitution of counsel; and that because counsel are schooled in matters of evidence, Ms. Menashe's and Mr. Gatterdam's conclusions regarding the ledgers defendants wanted them to introduce were persuasive. Ultimately, the district court discounted defendant's claim of a breakdown in communication, finding that it was completely self-imposed. This Court has previously held that "a lack of communication resulting from a defendant's refusal to cooperate with his attorney does not constitute good cause for substituting counsel." *Marrero*, 651 F.3d at 466 (citation omitted). The district court's conclusions here were not unreasonable or an abuse of discretion.

Finally, the Court must weigh the first three factors against the public's interest in the prompt and efficient administration of justice. That Jackson loses in this balancing of factors is clear. Given that the motion was made on the day trial was set to begin, the jurors were already present and the prosecution had already expended resources to have witnesses and members of its prosecution team—who were not from Ohio—present and ready to begin trial. Even further, Jackson's counsel stated that she was prepared to proceed with trial, and that there was still enough time for her and Jackson to complete their unfinished collaborative tasks, since it would be a week before the defense presented its case in chief. As such, the district court did not abuse

its discretion in concluding that the public's interest in the prompt efficient administration of justice weighed in favor of denying the motion to substitute counsel. *See Trujillo*, 376 F.3d at 607. For these reasons, we find that the district court's denial of Jackson's motion to substitute counsel was not an abuse of discretion.

### III.    INEFFECTIVE ASSISTANCE OF COUNSEL

Jackson next argues that his trial counsel was ineffective in two ways: (1) before trial for failing to move for a severance; and (2) after trial for failing to file a motion for mistrial. According to Jackson, the jury heard prejudicial evidence about Preston and Lovena that would not have been admissible against him had he been tried separately.

This Court, as a general rule, does "not consider on direct appeal whether defense counsel's performance constituted constitutionally ineffective assistance, primarily because 'there has not been an opportunity to develop and include in the record evidence bearing on the merits' of that issue." *United States v. Herrera-Zuniga*, 571 F.3d 568, 592 (6th Cir. 2009) (quoting *United States v. Wunder*, 919 F.2d 34, 37 (6th Cir. 1990)). We have recognized an exception to this general rule where "the parties have adequately developed the record." *United States v. Foreman*, 323 F.3d 498, 502 (6th Cir. 2003) (quoting *United States v. Pierce*, 62 F.3d 818, 833 (6th Cir. 1995)). This exception, however, is inapposite here. As it stands, the record does not contain any factual basis that will allow the Court to do more than speculate. Because we find that the record is not sufficiently developed, we decline to address this claim, without prejudice to Jackson's right to raise it in a proper post-conviction proceeding.

### IV.    LOSS CALCULATION

Jackson argues that the district court erred in determining an amount of loss of $9.3 million for two reasons: (1) the investment from Shaffer Smith should not have been

included in this amount because he did not rely on any of the materials prepared by Jackson, nor did he have any direct communication with Jackson before deciding to invest; and (2) the investments of the thirteen investor victims that did not testify at trial should not have been included in the loss calculation because the prosecution did not provide any evidence that they relied on false statements from Jackson, or on materials prepared by Jackson.

## A. FACTS

At trial, the prosecution presented testimony from investors Kendrick Gregory, Aaron Stumpf, Joseph Crispin, Shaun Stonerook, William Culman, and Shaffer Smith. Kendrick Gregory testified that he invested a total of $680,000; Aaron Stumpf invested $125,000; Joseph Crispin invested a total of $175,000; Shaun Stonerook invested a total of $750,000; and William Culman invested $500,000. These five investors testified that they relied on either the PPM or communications with Jackson, Harrison, and/or Smith in making their investments.

Shaffer Smith testified that he heard of OXYwater through his then business manager, Kevin Foster. He further testified that at the time, he relied on Foster to manage his finances and conduct due diligence into potential investments. Foster essentially told him that OXYwater was going to overtake Vitaminwater, replace sugary drinks in schools, and become the official drink of a certain basketball team. Based on Foster's representations and recommendations about OXYwater, Shaffer Smith invested a total of $2.5 million. The prosecution also introduced evidence that in October 2012, Foster made an additional investment of $500,000 from Shaffer Smith's accounts without his knowledge or authorization. Ultimately, IRS Agent David Gosiewski testified that total amount of investments made into Imperial was approximately $9 million.

The presentence investigation report ("PSR") found that Jackson was responsible for a total loss to investors of $8,840,706, and that the scheme included a total of nineteen investor victims. Based on these findings, the PSR increased Jackson's base offense level by twenty points—for an actual loss amount greater than $7 million, but less than $20 million—and by an additional two points—for more than ten victims, but less than fifty. During Jackson's sentencing hearing, the prosecution argued that since the trial, they had discovered more loss which increased the total amount invested to $9,342,200. The prosecution further argued that this amount was the proper loss amount because Jackson's claims were "demonstrably rife with fraud" and thus, "the minute any penny came in, it was ill-gotten gains because it was premised on the fraud."

Following arguments from the defense and the prosecution, the district court concluded that the increased amount was correctly calculated, but even so, it did not change the Guidelines calculation.

## B. ANALYSIS

Our review of the reasonableness of a sentence is for abuse of discretion. *United States v. Collins*, 828 F.3d 386, 388 (6th Cir. 2016) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). "A district court abuses its discretion in the sentencing context if it 'commits a significant procedural error,' 'selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor.'" *Id.* (quoting *Gall*, 552 U.S. at 51; *United States v. Conaster*, 514 F.3d 508, 520 (6th Cir. 2008)) (alterations removed). We review a challenge to the district court's loss calculation for clear error. *United States v. Martinez*, 588 F.3d 301, 326 (6th Cir. 2009) (citing *United States v. Blackwell*, 459 F.3d 739, 772 (6th Cir. 2006)). The defendant has the burden of

"demonstrating 'that the court's evaluation of the loss was not only inexact but outside the universe of acceptable computations.'" *Id.* (citing *United States v. Raithatha*, 385 F.3d 1013, 1024 (6th Cir. 2004)).

First, Jackson argues that the amount invested by Shaffer Smith should not be included in the loss amount calculation. "When determining the amount of loss for sentencing purposes, 'a defendant will be held accountable for the actual or intended loss to a victim, whichever is greater, or a combination thereof.'" *Id.* (citing *Raithatha*, 385 F.3d at 1024). Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." USSG § 2B1.1 cmt. 3(A)(i). Intended loss, on the other hand, is "the pecuniary harm that the defendant purposefully sought to inflict and includes intended pecuniary harm that would have been impossible or unlikely to occur." USSG § 2B1.1 cmt. 3(A)(ii). Additionally, "[t]he loss must be 'caused' by the defendant's fraud." *United States v. Turner*, 615 F. App'x 264, 268 (6th Cir. 2015) (quoting *United States v. Rothwell*, 387 F.3d 579, 583 (6th Cir. 2004)).

At trial, Robert Smith testified that he, Jackson, and Harrison met with Foster in 2011 and gave him a presentation on OXYwater, told him what they wanted to do with the product, and how much capital they wanted to raise. Smith also testified that they provided Foster with the same presentation that they typically showed investors—i.e., that the product was oxygen-enhanced and that they had former Vitaminwater employees on their team. Foster then informed them that he had a lot of "high-net-worth" clients and could raise all the money they needed. Smith further testified that after meeting with Foster, they knew who some of Foster's clients were and knew that Shaffer Smith—award-winning recording artist known by the stage name "Ne-Yo"—was one. Based on this, the district court did not err in including the investments made by Shaffer Smith in the amount of loss calculation. Although Shaffer Smith did not have

any direct interaction with Jackson, Harrison, or Smith, he was induced to invest by the false representations made by them to his financial manager, Foster. Even further, Foster was given a presentation about OXYwater with the intention of seeking investments from his clients. That the amount invested by Foster on behalf of Shaffer Smith, both with and without his permission, was a reasonably foreseeable pecuniary loss is clear.

Jackson's second argument concerns the district court's inclusion of amounts invested by non-testifying investors. Jackson argues that these amounts should not be included not just because these investors did not testify at trial, but because the prosecution failed to prove that but for Jackson's misrepresentations, these investors would not have invested. However, when fraud permeates an entire investment enterprise, a district court may find that the loss amount includes the entire amount invested. *See Turner*, 615 F. App'x at 268–69; *United States v. Healy*, 553 F. App'x 560, 565–67 (6th Cir. 2014). Such a finding is sufficiently supported by the record. The testimony presented at trial indicated that Jackson began making fraudulent misrepresentations very near the time he began soliciting investments. According to Robert Smith, Kendrick Gregory, who testified at trial, was one of their first significant investors. At this point, Jackson and Harrison were already making misrepresentations about the composition of OXYwater and disseminating the materially false PPM. This Court has upheld amount of loss calculations such as this where the defendant made fraudulent misrepresentations from the onset. *See Healy*, 553 F. App'x at 566; *see also Turner*, 615 F. App'x at 268.

This conclusion is not changed by the fact that OXYwater was actually an existing product and that it, in fact, incurred some legitimate business expenses. In *Healy*, this Court noted that because the district court determined that the defendant intended to defraud his investors from the outset, the entire amount was properly included, and none of the expenses

- 15 -

could be described as "legitimate." 553 F. App'x at 566–67. This reasoning is equally applicable here. Upon finding that the fraud permeated the entire enterprise from its inception, it was within the district court's discretion to find that the amount of loss included every amount that was invested into the enterprise. In making loss estimates, "the 'sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence,' and [] the district court's loss determination is due 'appropriate deference.'" *Turner*, 615 F. App'x at 268 (quoting *United States v. McCarty*, 628 F.3d 284, 290 (6th Cir. 2010)). For all of the foregoing reasons, the district court did not err in calculating the loss amount.

## V.     SUBSTANTIVE UNREASONABLENESS OF SENTENCE

Finally, Jackson argues that his sentence is substantially unreasonable because it is overwhelmingly based on the loss amount, and because it is greater than necessary to achieve the statutory goals of sentencing.

## A.  FACTS

Following the arguments from the defense and the prosecution at Jackson's sentencing hearing, the district court heard impact statements from three investor victims and one former OXYwater employee, and heard statements from twelve people speaking on behalf of Jackson. The court also heard a statement from Jackson. In a monologue spanning approximately seven pages, the district court separately considered each of the seven 18 U.S.C. § 3553(a) factors before announcing Jackson's sentence.

For the first factor, the court found that Jackson was convicted of very serious crimes which were compounded by the fact that people lost their life savings as a result of his actions. Although the court noted that Jackson had good characteristics and no criminal history, the court found that the seriousness of the offenses outweighed any positive history. For the second

factor, the court stated that Jackson did not need educational or correctional treatment and that he had a low risk of recidivism; however, the court found that a severe sentence was necessary to reflect the seriousness of the offense and promote general deterrence. The district court noted for the third and fourth factors that a prison sentence was the only option, but also stated that it would take into consideration that Jackson's applicable Guideline range would be only 78–97 months under the forthcoming November 2015 Guidelines amendments.[1] The fifth factor required the court to take into consideration pertinent policy statements, and the court found that the policy statements regarding family and children were considerably outweighed by the policy statements involving the theft of money from other people and fraud. For the sixth factor, the court found that a good example of similar conduct was co-defendant Harrison, and that his conduct and resulting sentence were directly on point, so there were no unwarranted sentencing disparities. Finally, the district court found that there was a need to make restitution to the victims.

Following these findings, the district court sentenced Jackson to a total term of eighty-three months in prison with three years of supervised release, and ordered him to pay restitution in the amount of $8,840,706. Jackson's sentence was therefore fourteen months below the then-applicable Guidelines range, and within the range established by the forthcoming Guidelines amendments.

## B. ANALYSIS

We review the substantive reasonableness of a sentence for abuse of discretion. *United States v. Jeter*, 721 F.3d 746, 757 (6th Cir. 2013) (citing *Gall*, 552 U.S. at 46). "A sentence is substantively unreasonable if the district court selects a sentence arbitrarily, bases the sentence

---

[1] Jackson's sentencing hearing was held in October 2015.

on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *Id.* (quoting *United States v. Shaw*, 707 F.3d 666, 674 (6th Cir. 2013)). A below-Guidelines sentence, like a within-Guidelines sentence, is "presumptively reasonable." *United States v. Sierra-Villegas*, 774 F.3d 1093, 1103 (6th Cir. 2014) (citing *United States v. Curry*, 536 F.3d 571, 573 (6th Cir. 2008) (per curiam)); *United States v. Graham*, 622 F.3d 445, 464 (6th Cir. 2010) (citation omitted). And the presumption is stronger for a below-Guidelines sentence than for a within-Guidelines sentence. *Curry*, 536 F.3d at 573 ("[S]imple logic compels the conclusion that, if a [within-Guidelines sentence] would have been presumptively reasonable in length, a defendant's task of persuading us that the more lenient [below-Guidelines sentence] is unreasonably long is even more demanding.").

18 U.S.C. § 3553(a) outlines the factors to be considered in imposing a sentence. The statute further provides that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of § 3553(a)(2). As outlined above, the district court considered all seven factors set forth in § 3553(a) and thoroughly detailed the reasons for its findings.

It is true, as Jackson argues, that the district court placed emphasis on the amount of loss, but the record does not indicate that this assignment of weight was unreasonable. The district court reviewed the § 3553(a) factors, placing great weight on the severity of the offense, and the fact that the effects of Jackson's actions were far-reaching. The district court did not assign an unreasonable weight to the amount of loss; instead, the record in its entirety indicates that the district court considered the amount of loss along with the pertinent § 3553(a) factors and concluded that the seriousness of the offense and the need for punishment required a sentence of eighty-three months.

This Court has upheld the reasonableness of sentences where the court did not explain each § 3553(a) factor that it considered to arrive at a sentence. *See, e.g., United States v. Collington*, 461 F.3d 805, 809 (6th Cir. 2006) (citing *United States v. Vonner*, 452 F.3d 560 (6th Cir. 2006)) ("[A] reasonable sentence based on consideration of the factors does not require a rote listing."). The reasonableness of the sentence imposed is even more persuasive where, as here, the district court thoroughly identified its reasoning on each factor, and then actually imposed a sentence below the then-applicable Guidelines range. Jackson has not sufficiently rebutted the presumption that his sentence is reasonable.

## VI. CONCLUSION

For the reasons detailed above, we **AFFIRM** Jackson's convictions and sentence.