NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0271n.06

No. 22-3569

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Jun 13, 2023
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| BRANDON J. SHARP, | ) | OHIO |
| Defendant-Appellant. | ) | OPINION |
| | ) | |

Before: GIBBONS, LARSEN, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. The combination of an anonymous tip and a police dog's alert led the police to find a large amount of fentanyl, heroin, and cocaine in Brandon Sharp's semitruck. On the first day of Sharp's trial for various drug offenses, he criticized his counsel and asked the district court to appoint him a substitute attorney. When the court denied his request, Sharp refused to attend his trial. The court held the trial without Sharp, and a jury convicted him. Treating Sharp as a career offender, the court sentenced him to 175 months' imprisonment. Sharp now challenges the police seizure of his semitruck, the district court's refusal to appoint him substitute counsel, its decision to hold the trial without him, the sufficiency of the evidence, and the career-offender enhancement. Rejecting these many claims, we affirm. We separately reserve consideration of Sharp's challenge to the effectiveness of his trial counsel for collateral review.

I

Just before 8:00 a.m. on June 29, 2020, an anonymous caller reported a crime to the police department in Lorain, Ohio. The caller had learned from a friend that her friend's son had dropped off a package of fentanyl in the front wheel well of a Western Express semitruck parked on the city's residential streets. The caller added that the drugs were in a green bag and that the semitruck was registered to a man named Brandon.

The police found a semitruck matching the caller's description at the identified location. Aside from the suspected drug activity, the truck's owner had violated a city ordinance that barred commercial vehicles from parking on city streets. The police decided to have a K9 unit conduct a drug sniff. The police dog, Rye, alerted to the presence of drugs near the truck's passenger-side door and again near the driver-side front wheel well. While next to the wheel, Rye "almost grabbed a green bag" and knocked it to the ground. Tr., R.80, PageID 589, 606. The officers could see through this mesh bag. It contained two smaller plastic bags and a note that read "Brandon, call me." *Id.*, PageID 591. The smaller bags contained different powders that resembled fentanyl and heroin. Later lab testing confirmed that one bag contained 5.3 grams of a mix of fentanyl and phenyl fentanyl and that the other bag contained 4.08 grams of a mix of heroin and fentanyl.

The officers decided to tow the semitruck. While they were waiting for the tow, Alicia McCoy approached them. She explained that the truck belonged to her boyfriend, Brandon Sharp. When interacting with the officers, McCoy spoke with Sharp over the phone. Sharp asked to speak with the officers. He claimed to be in possession of the semitruck and asked why the officers were there. At that time, the officers chose to tell Sharp and McCoy only about the parking violation, not about the suspected drugs. Sharp suggested that he would come to the scene to move the truck

and avoid the tow, but he never arrived. The officers instead gave McCoy the parking citation to pass along to him.

Before towing vehicles, the Lorain police generally undertake inventory searches. But they decided not to inventory the inside of the semitruck at the scene because its doors were locked. The towing company used a tool to open a door and release the air brakes. It then towed the truck.

The same morning, a Lorain narcotics detective began to investigate. He called McCoy, who confirmed that the semitruck belonged to Sharp. The detective then received a call from Sharp. Sharp admitted that the truck was his and asked why a narcotics detective was investigating a mere parking offense. The detective told Sharp to come to the department to talk in person. Sharp suggested he would visit that day but again failed to show up. Western Express separately confirmed for the detective that the semitruck was Sharp's.

After the powders in the green bag preliminarily tested positive for illegal substances, the detective obtained a warrant to search the truck. Later that day, he and other investigators conducted this search at the towing company's facility. Inside the semitruck's cab, the officers found mail addressed to Sharp. They also found a large amount of cash ($2,020) hidden in a lunch box—a common sign of drug activity because traffickers often transact business in cash. And they found a hollowed-out can of tire cleaner with a false bottom—another common sign of drug activity because traffickers often conceal drugs in this type of can. Lastly, the officers uncovered two more bags of powder behind the driver's seat. Lab testing later revealed that one bag contained about 77 grams of a mixture of fentanyl and phenyl fentanyl and the other contained about 41 grams of a mixture of cocaine and heroin. A drug trafficker (not a drug user) would more likely possess these distribution-level amounts of the drugs.

The government charged Sharp with four counts of possession with the intent to distribute illegal narcotics—one count each for the four bags of drugs that the police recovered. *See* 21 U.S.C. § 841(a)(1), (b)(1)(B)–(C). Before trial, Sharp's counsel moved to suppress the evidence recovered from Sharp's semitruck. The court denied the motion.

At trial, Sharp put the district court's trial-management abilities to the test. Before jury selection on the first day, Sharp asked the district court: "I would like to know why you are forcing me to be represented by an incompetent attorney." Tr., R.78, PageID 424. He then made a litany of complaints against counsel and alleged that the police had planted the drugs in his truck. The court responded that Sharp's counsel had previously been named one of Ohio's top criminal defense lawyers and that it had seen nothing to suggest that counsel had acted incompetently. Despite having multiple pretrial conferences, Sharp had also belatedly raised these concerns. The court thus denied his request for a substitute attorney, while noting that Sharp had the right to hire a different lawyer using personal funds.

After continuing to argue with the court and defense counsel, Sharp exclaimed: "This is ridiculous, ridiculous. I don't wish to proceed with this. He is forcing me to go to trial with an attorney who is sabotaging my case." *Id.*, PageID 434–35. As potential jurors filed into the courtroom, Sharp reiterated that he would refuse to participate in the trial with a lawyer "who is clearly sabotaging my case." *Id.*, PageID 436. The court confirmed with Sharp that he did not want to attend the trial, and Sharp was led out of the courtroom.

After jury selection, the court reiterated on the record its reasons for denying Sharp's motion for a new attorney. Defense counsel had spent substantial time on Sharp's case. And the substitution would require a prejudicial delay.

Sharp returned to the court for opening statements on the same day (a Friday afternoon). He told the court that he would like to represent himself or hire his own attorney with his family's help once the trial resumed on Monday. The court explained that Sharp had the weekend "to do whatever you need to do" but that his current counsel would present opening statements. Tr., R.79, PageID 538. Sharp remained quiet during the court's instructions and the government's opening statements. Once his counsel got up to speak, though, Sharp objected that his counsel was "not my attorney" because Sharp had "fired him." *Id.*, PageID 554. Sharp added, among other things, that counsel "should not be making any comments" because "[h]e works for the prosecutor." *Id.* The court ordered the Marshals to remove Sharp. *Id.*, PageID 555. Sharp's counsel then gave his opening statement.

First thing Monday morning, Sharp suggested that he had hired another attorney and asked for a "short continuance" until this attorney contacted the court. Tr., R.80, PageID 564–65. Yet neither the court nor the lawyers could reach this attorney. (The attorney later confirmed that Sharp had not retained him.) The court refused to delay the trial. It asked if Sharp wanted to stay in the courtroom, and Sharp said that he did not "want to continue." *Id.*, PageID 569. The court had also arranged for Sharp to receive audio of the trial in his cell. But Sharp refused to listen to the proceedings too.

After the government presented its witnesses, Sharp's counsel asked him if he would like to testify in his defense. Sharp originally suggested that he would like to tell his side of the story. But the Marshals who went to retrieve him told the court that he refused to come to the courtroom. So Sharp's counsel visited him again. This time, Sharp told counsel that "he is not going to participate in the thing[.]" *Id.*, PageID 741. The next day, Sharp again refused to attend the closing arguments.

5

The jury found Sharp guilty on all four counts. The district court sentenced him to a total term of 175 months' imprisonment.

## II

Sharp raises many challenges on appeal. Starting with the pretrial proceedings, he claims that the district court should have suppressed the evidence uncovered from his truck. Turning to the trial, he asserts that the court should have appointed him new counsel or given him time to hire counsel using his own funds. He also alleges that the court should not have held the trial in his absence and that the government presented insufficient evidence. As for his sentencing, Sharp argues that the court wrongly imposed a career-offender enhancement. We disagree on all fronts and also find the record insufficiently developed to decide Sharp's additional claim that his counsel provided ineffective assistance.

A. *Motion to Suppress*. Sharp argues that the police violated the Fourth Amendment when they towed his semitruck and that the drugs found during the later search of his truck represent "fruits of the poisonous tree." Appellant's Br. 57. The Fourth Amendment bars "unreasonable" "seizures." U.S. Const. amend. IV. The officers in this case chose to tow Sharp's truck—that is, to "seize" it—for two reasons. Sharp had parked the truck "illegally" on the city streets. Tr., R.38, PageID 144. And the officers planned to "obtain a search warrant for the vehicle" because Rye, the police dog, had alerted to the presence of drugs in the truck. *Id.*

On appeal, Sharp argues that the officers' decision to tow his truck violated a provision in the Lorain traffic code and that this violation rendered the seizure unreasonable. Specifically, he says that the traffic code did not permit the officers to tow an illegally parked truck unless the owner had committed two prior parking infractions. And here, Sharp adds, the government introduced no evidence that he had committed earlier violations.

6

This argument has at least two problems. Problem One: Sharp did not make the argument in the district court, so we will review it only for plain error. *See United States v. Davis*, 970 F.3d 650, 664 (6th Cir. 2020). A state-law violation does not automatically render a search or seizure unreasonable under the Fourth Amendment. *See id.* at 665. Even if it did, Sharp has not shown that it is "obvious" that the Lorain traffic code barred the officers from towing his truck for his first parking offense. *Id.* (citation omitted). The provision that Sharp cites *requires* officers to tow a vehicle upon a third offense; it does not *prohibit* them from towing a vehicle for earlier offenses. *See* Codified Ordinances of Lorain, Ohio § 351.99(c) (2022). Because Sharp has not identified a "clear" "state-law error," he has not met the demanding plain-error test. *Davis*, 970 F.3d at 665 (citation omitted).

Problem Two: Sharp ignores the other rationale for the decision to tow his truck: the police had probable cause that it contained drugs. Our caselaw suggests that Rye's sniff around the truck did not qualify as a "search" and so did not require probable cause or reasonable suspicion under the Fourth Amendment. *See United States v. Dyson*, 639 F.3d 230, 232–33 (6th Cir. 2011). And it suggests that Rye's alert to the presence of drugs gave the officers the probable cause required to *search* the truck on the street. *See United States v. Williams*, 68 F.4th 304, 311 (6th Cir. 2023); *United States v. Winters*, 782 F.3d 289, 304 (6th Cir. 2015). But did these facts also give the officers probable cause to *seize* the truck by towing it? The limited caselaw on that topic would also suggest that they could. *See Chambers v. Maroney*, 399 U.S. 42, 52 (1970); *United States v. Swanson*, 341 F.3d 524, 531–33 (6th Cir. 2003); *cf.* Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 7.2(c) (6th ed.), Westlaw (database updated Oct. 2022). But we need not decide the issue. Because Sharp's briefing ignored this second rationale for the decision to tow the truck, he forfeited any argument that the police could not seize it based on the

probable cause to believe it contained drugs. *See White Oak Prop. Dev., LLC v. Washington Township*, 606 F.3d 842, 854 (6th Cir. 2010). And because the district court relied on this independent rationale, we can affirm its denial of his motion to suppress on this forfeiture ground alone. *See id.*; *United States v. Fox*, 363 F. App'x 375, 376–77 (6th Cir. 2010).

B. *Request for New Counsel*. Turning to his trial, Sharp argues that the district court should have appointed him new counsel. The Supreme Court has long interpreted a criminal defendant's Sixth Amendment right "to have the assistance of counsel" to include the right to the appointment of counsel at public expense for defendants who cannot afford lawyers. U.S. Const. amend. VI; *see Gideon v. Wainwright*, 372 U.S. 335, 344–45 (1963). But indigent defendants (unlike defendants who can pay for counsel) do not have the right to choose the specific lawyer who will defend them. *United States v. Iles*, 906 F.2d 1122, 1130 (6th Cir. 1990); *cf. United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006).

To obtain substitute counsel, therefore, defendants with appointed counsel must identify a "good cause" as to why their current counsel cannot continue on their case. *United States v. Wells*, 55 F.4th 1086, 1090 (6th Cir. 2022) (citation omitted). When deciding whether a defendant has shown a good enough reason for substitution, a district court generally may consider many factors. Over the years, we have identified four commonly recurring ones: Did the defendant timely request new counsel? Did the district court conduct an adequate inquiry into the request? Would the defendant's disagreements with counsel undermine counsel's ability to present a defense? And would granting the defendant's request harm the efficient administration of criminal justice? *See id.* at 1090–91; *United States v. Jennings*, 83 F.3d 145, 148 (6th Cir. 1996). Given the fact-bound nature of this inquiry, we review a district court's decision under the deferential abuse-of-

discretion standard. *See United States v. Steele*, 919 F.3d 965, 973 (6th Cir. 2019); *United States v. White*, 451 F.2d 1225, 1226 (6th Cir. 1971) (per curiam).

We see no abuse of discretion. Far from it. All four of our recurring factors supported the denial of Sharp's last-minute request for substitute counsel. To begin with, this request—on the first day of trial—fell firmly on the "untimely" side of the line. *See United States v. Jackson*, 662 F. App'x 416, 423 (6th Cir. 2016); *United States v. Griffin*, 476 F. App'x 592, 597 (6th Cir. 2011); *United States v. Justice*, 14 F. App'x 426, 430–31 (6th Cir. 2001) (per curiam); *see also United States v. Reevey*, 364 F.3d 151, 157 (4th Cir. 2004); *United States v. McClendon*, 782 F.2d 785, 789 (9th Cir. 1986); *United States v. Kerris*, 748 F.2d 610, 615 (11th Cir. 1984). By the time of trial, Sharp had known about his concerns for months. When counsel filed the motion to suppress, for example, Sharp asked counsel to request a "*Franks* hearing" to consider whether the detective who sought the search warrant had lied in his affidavit. *See Franks v. Delaware*, 438 U.S. 154 (1978). Counsel refused. Yet Sharp waited until jury selection to raise this stale concern. In similar circumstances, we have found requests for new counsel untimely even when defendants filed them weeks before trial. *See United States v. Chambers*, 441 F.3d 438, 447 (6th Cir. 2006) (six weeks before trial); *United States v. Williams*, 176 F.3d 301, 314 (6th Cir. 1999) (two weeks before trial); *United States v. Vasquez*, 560 F.3d 461, 467 (6th Cir. 2009) (week before trial); *United States v. Wilhite*, 108 F. App'x 367, 369 (6th Cir. 2004) (per curiam) (six days before trial); *United States v. Trujillo*, 376 F.3d 593, 606–07 (6th Cir. 2004) (three days before trial).

When discussing this timeliness factor, Sharp responds that the record leaves "unclear" whether he diligently requested new counsel. Appellant's Br. 36. He argues that he had previously "sent letters" to the court complaining about counsel, that he had not personally appeared in court for months before trial, and that he had told his counsel that he wanted a new attorney. *Id.* at 36–

37. None of these reasons changes things. The record does not include his purported letters, so we may not consider them. *See* Fed. R. App. P. 10(a); *United States v. Wagner*, 382 F.3d 598, 615 & n.4 (6th Cir. 2004). Besides, Sharp's description of the letters shows that they likely would not have mattered. The letters did not request new counsel. Yet our caselaw ties this timeliness factor to an actual motion for new counsel—not an abstract complaint about current counsel. *Jennings*, 83 F.3d at 148. And even though he did not attend his pretrial hearings, Sharp could have told his counsel to file a motion to substitute during the months before trial. According to his counsel, however, he did not broach the possibility of "want[ing] a new attorney" until counsel was in the final stages of trial preparation about a week before trial. Tr., R.79, PageID 531.

As for our second factor, the district court appropriately considered Sharp's request for substitute counsel. *See Iles*, 906 F.2d at 1130 & n.8. The court only needed to let him describe his concerns in his own words. *See United States v. Marrero*, 651 F.3d 453, 465 (6th Cir. 2011). The court did that and much more. Its discussions with Sharp and his attorney about the issue "span many transcript pages"—almost a dozen. *Vasquez*, 560 F.3d at 467. And Sharp took up several of these pages airing his grievances without interruption. Tr., R.78, PageID 424–27.

As for our third factor, Sharp's disagreement with his counsel did not stop counsel from adequately (indeed, vigorously) defending him. *See Jennings*, 83 F.3d at 149. Before trial, counsel filed several motions to suppress or exclude evidence and sought to obtain everything from the government that Sharp had demanded. Tr., R.79, PageID 524–25. During trial, counsel also raised Sharp's preferred defense that somebody had planted the drugs in his truck. And as much as Sharp and his lawyer had trouble communicating, that fact stemmed from Sharp's own "refusal to cooperate" with the lawyer. *Marrero*, 651 F.3d at 466. But Sharp's "self-imposed"

communication barrier does not justify substitution. *Jackson*, 662 F. App'x at 423. If it did, a defendant could simply refuse to speak with a current lawyer in order to obtain a new one.

As for our fourth factor, a decision to grant Sharp's request for a new attorney would have undermined the efficient administration of justice. *See id.* at 424. Sharp's belated request would have prejudiced the court, the jurors, the government, and the witnesses—all of whom had prepared to proceed. In addition, the record suggests that Sharp's concerns with counsel arose from his demands for counsel to engage in "frivolous" actions. Tr., R.79, PageID 527. Take his request that counsel ask for a *Franks* hearing. Sharp identifies "no evidence" that the search-warrant affidavit in this case contained any lies, which, according to the district court, were all in Sharp's "imagination." *Id.*, PageID 528. A court should not replace counsel for refusing to file a "frivolous" motion. *United States v. Saldivar-Trujillo*, 380 F.3d 274, 278 (6th Cir. 2004).

Even though the district court properly found that all four factors cut against him, Sharp ends with a different point. After the court denied his motion for substitute counsel, Sharp later suggested that he wanted to "hire a new attorney" using personal funds with his family's help. Tr., R.79, PageID 537. Sharp claims that the Sixth Amendment required the court to delay the trial to give him a chance to retain counsel of his choice. Appellant's Br. 41. He is wrong for the same reasons. To be sure, the Sixth Amendment gives a defendant who can afford counsel the right to pick "who will represent him." *Gonzalez-Lopez*, 548 U.S. at 144. Yet this right does not permit defendants to "manipulate" the proceedings by requesting new counsel at prejudicial times. *Griffin*, 476 F. App'x at 597 (citation omitted). Rather, a court may account for the "demands of its calendar" by refusing eleventh-hour requests to change lawyers. *Gonzalez-Lopez*, 548 U.S. at 152. In fact, we give "extraordinary deference" to the district court's denial of a request for a new attorney that would require a "last-minute continuance" of trial. *United States v. Powell*, 847 F.3d

11

760, 779 (6th Cir. 2017) (quoting *Vasquez*, 560 F.3d at 467). That was precisely the situation that the district court faced here. *Cf. United States v. Robinson*, 662 F.3d 1028, 1032 (8th Cir. 2011). It did not abuse its discretion by refusing to delay the trial.

C. *Absence from Trial*. Sharp next contends that the district court wrongly held his trial in his absence in violation of the Constitution and Federal Rule of Criminal Procedure 43. The Fifth Amendment's Due Process Clause and Sixth Amendment's Confrontation Clause give defendants the right to attend much of their trials. *See United States v. Gagnon*, 470 U.S. 522, 526 (1985). Likewise, Rule 43 creates a complimentary (non-constitutional) right for a defendant to attend trial, requiring a court to ensure the defendant's presence at "every trial stage" of a case. Fed. R. Crim. P. 43(a)(2); *see United States v. Hills*, 27 F.4th 1155, 1187 (6th Cir. 2022).

That said, Sharp's briefing ignores the rest of Rule 43. He also does not distinguish between the constitutional and rule-based rights, so we will not discuss them separately. *But cf. United States v. Gibbs*, 182 F.3d 408, 436–37 (6th Cir. 1999); *United States v. Brown*, 571 F.2d 980, 986 (6th Cir. 1978). Rule 43 makes clear that a defendant can waive the right to attend trial in various ways. Such a waiver occurs "when the defendant is voluntarily absent after the trial has begun, regardless of whether the court informed the defendant of an obligation to remain during trial[.]" Fed. R. Crim. P. 43(c)(1)(A). It also occurs "when the court warns the defendant that it will remove the defendant from the courtroom for disruptive behavior, but the defendant persists in conduct that justifies removal from the courtroom." Fed. R. Crim. P. 43(c)(1)(C).

Sharp has forfeited any argument that he did not waive his right to attend trial under these provisions. As an initial matter, he does not dispute the government's claim that he "voluntarily" missed most of his trial. Fed. R. Crim. P. 43(c)(1)(A). Once the court refused to grant him new counsel, Sharp called the proceedings "ridiculous" and stated that he did not wish "to continue"

12

with the trial. Tr., R.78, PageID 434–35. The court told the jury in Sharp's presence that a "[d]efendant has a right to participate in a trial if he or she wishes, or if they don't want to, they don't have to either." *Id.*, PageID 436. It then asked Sharp—point blank—whether he wanted to participate. *Id.* Sharp said no. *Id.*, PageID 437. So he missed jury selection. The next day, Sharp again stated "I don't want to continue" in response to the court's question whether he wanted to "sit here" or "leave." Tr., R.80, PageID 569. Sharp thus missed the government's case in chief. When his time came to present a defense, the Marshals and his counsel both noted that Sharp refused to leave his holding cell. *Id.*, PageID 741. He lastly told the Marshals that he would not leave the jail for closing arguments the next day. Tr., R.81, PageID 771. Because Sharp does not attempt to make what would likely be an "incredible" claim that these absences were involuntary, we need not consider any contrary argument. *Taylor v. United States*, 414 U.S. 17, 20 (1973).

This conclusion leaves one last absence. After jury selection on the first day, the court invited Sharp to attend the opening statements that afternoon. Tr., R.79, PageID 537. It told Sharp that, while he could try to hire counsel for the second day of trial, his current counsel would make his opening statement. *Id.*, PageID 537–38. When his attorney got up to speak, however, Sharp disrupted the proceedings by stating, among other things, that he had "fired" his counsel, who was "work[ing] for the prosecutor." *Id.*, PageID 554. The court responded: "All right. That's enough. Take him out." *Id.*, PageID 555. This absence does not appear voluntary. Perhaps the district court concluded that Sharp had "persist[ed] in conduct that justifies removal from the courtroom." Fed. R. Crim. P. 43(c)(1)(C). Yet the court had not previously warned Sharp that his disruption would trigger this removal—as the rule requires. *Id.* In any event, Sharp's absence during his counsel's opening statement likely caused no harm. *See Gibbs*, 182 F.3d at 437–38; *cf. United States v. Lucky*, 569 F.3d 101, 107–08 (2d Cir. 2009). Yet we also need not decide these

13

(unbriefed) issues. Although Sharp mentioned this one exchange in passing, he did so to suggest that his conduct negatively affected the jurors' attitudes of him. Appellant's Br. 46–47. He did not coherently argue that his absence during this short part of the trial violated the Constitution or Rule 43. We thus view any such argument as forfeited. *See United States v. McShan*, 757 F. App'x 454, 460–61 (6th Cir. 2018); *United States v. Johnson*, 440 F.3d 832, 845–46 (6th Cir. 2006)

Sharp does, by contrast, challenge two other specific absences. After he voluntarily left the courtroom on the first day, the district court held a hearing with counsel in which it reiterated the reasons why it had denied Sharp's request for substitute counsel. Sharp claims he did not "knowingly waive" his right to attend this hearing. Appellant's Br. 43. But the court merely summarized the reasons why it had already denied Sharp's motion in his presence. And by this point, Sharp had told the court that he did not want to participate in the proceedings. Tr., R.78, PageID 435. He offers no support for the claim that this waiver was unknowing.

Sharp also argues that the district court should have "directly" asked him whether he wanted to testify to ensure that he knowingly declined. Appellant's Br. 48. Yet "not all fundamental rights"—including the right to testify—require this sort of colloquy. *United States v. Stover*, 474 F.3d 904, 908 (6th Cir. 2007). A defendant's actions themselves can show the required waiver. *See id.* And Sharp's actions here more than sufficed to establish this waiver. When the court tried to get him to come to the courtroom, Sharp refused to leave his cell and told the Marshalls and his counsel that he did not want to testify. Tr., R.80, PageID 741.

Nor is this case like the one on which Sharp relies: *United States v. Ward*, 598 F.3d 1054 (8th Cir. 2010). There, the court held that the district court violated a defendant's right to attend trial by removing him for his disruptive conduct and failing to give him a "reasonable opportunity to return." *Id.* at 1060. Yet the district court in that case never discussed the defendant's right to

return with the defendant himself. *Id.* at 1059. Here, by contrast, the court allowed Sharp to return several times. And Sharp personally told the court twice that he did not want to participate.

D. *Sufficiency of the Evidence*. Sharp next claims that the government did not present enough evidence to convict him of possession with the intent to distribute illegal drugs. To succeed on this claim, Sharp must prove that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). His drug crimes required the government to prove the following elements: that he "knowingly or intentionally" "possess[ed]" a "controlled substance" and that he had the "intent to . . . distribute" it. 21 U.S.C. § 841(a)(1); *see United States v. Russell*, 595 F.3d 633, 645 (6th Cir. 2010); *United States v. Jackson*, 55 F.3d 1219, 1225 (6th Cir. 1995); *cf. United States v. Pope*, 561 F.2d 663, 670 (6th Cir. 1977). Because Sharp must show that a rational jury could not have found one of these "essential elements," his sufficiency challenge required him to identify the disputed element on appeal. *See United States v. Hinojosa*, 67 F.4th 334, 340–41 (6th Cir. 2023). Sharp did not identify any of these elements, let alone tell us the ones that he disputes.

At any rate, a rational jury could have found all of them. For one thing, we have repeatedly held that a rational jury could find that a defendant knowingly (if constructively) possessed contraband when the defendant had "dominion" over the "vehicle" in which the police found it. *United States v. Hall*, 20 F.4th 1085, 1106 (6th Cir. 2022) (quoting *United States v. White*, 932 F.2d 588, 589 (6th Cir. 1991) (per curiam)); *see also, e.g.*, *United States v. Smith*, 138 F. App'x 775, 782–83 (6th Cir. 2005); *United States v. Miller*, 2005 WL 1993339, at *6 (6th Cir. Aug. 16, 2005); *United States v. Rose*, 2000 WL 1434591, at *5 (6th Cir. Sept. 21, 2000) (per curiam). And here, overwhelming evidence showed that Sharp had control over the semitruck in (or on) which the police found the drugs. Sharp, his girlfriend, and Western Express all identified the truck as

Sharp's. The truck's cab also contained Sharp's mail. Apart from his ownership of the truck, moreover, the police recovered a note with Sharp's first name on it ("Brandon, call me") in the green bag that contained some of the drugs found on the outside of the truck. Tr., R.80, PageID 689. That someone left drugs hidden on Sharp's truck with a note addressed to him supports an inference that he had prior conversations with this person and knowingly acquiesced to the drop. *Cf. Rose*, 2000 WL 1434591, at *4–5; *United States v. Shull*, 349 F. App'x 18, 21–22 (6th Cir. 2009).

For another, we have repeatedly held that a rational jury could find the required "intent to distribute" from the mere possession of a large quantity of drugs. *See, e.g.*, *United States v. Edwards*, 473 F. App'x 429, 436 (6th Cir. 2012); *Jackson*, 55 F.3d at 1226; *United States v. Faymore*, 736 F.2d 328, 333 (6th Cir. 1984). And undisputed evidence showed that Sharp's semitruck contained a "significant amount of drugs" "indicative of someone involved in drug trafficking[.]" Tr., R.80, PageID 660. Sharp's jury did not even need to rely on the large quantity of drugs alone to find this intent. His truck also contained other telltale signs of trafficking, including the large amount of cash and the fake can of tire cleaner.

Sharp responds with legal and factual arguments. As a matter of law, he contends that no jury could convict him because the government presented a "circumstantial" case. Appellant's Br. 57. But black-letter law teaches that the government may convict a defendant with "circumstantial evidence alone[.]" *Jackson*, 55 F.3d at 1225; *see United States v. Algee*, 599 F.3d 506, 512 (6th Cir. 2010). As the classic example goes, undisputed evidence that a person walked in from outside soaking wet may be better evidence that it is raining than a conflicted eyewitness's claim to have seen the rain. *See* Sixth Circuit Pattern Criminal Jury Instruction § 1.06 (2023).

16

As a factual matter, Sharp cites evidence (such as his own unsworn hearsay to a detective) that the police or others "set him up[.]" Appellant's Br. 57. But the reasonable-doubt standard did not require the government to eliminate every possibility other than guilt. *See Algee*, 599 F.3d at 512 (citation omitted). And Sharp's counsel did an excellent job presenting this "set up" defense to the jury. Given the weighty contrary evidence pointing to Sharp's guilt, however, the jury's rejection of this defense provides no grounds to disturb its verdict. *See Hinojosa*, 67 F.4th at 341.

E. *Career-Offender Enhancement*. Running out of challenges to his convictions, Sharp turns to his sentence. The district court held that Sharp qualified as a career offender under U.S.S.G. § 4B1.1(a) because he had two prior Ohio convictions for marijuana trafficking. *See* Ohio Rev. Code § 2925.03(A)(2). This conclusion increased Sharp's guidelines range to between 262 and 327 months' imprisonment. The court varied downward from that range by imposing a 175-month sentence. But Sharp argues that this sentence really qualified as an *upward* variance. He asserts that the court should not have treated his two Ohio drug crimes as qualifying offenses under the career-offender guideline and that his guidelines range would otherwise have been only 63 to 78 months.

A state "controlled substance offense" qualifies for "career offender" treatment if, among other things, it bars the "distribution" of "a controlled substance" or the "possession of a controlled substance" with the "intent to" "distribute" it. U.S.S.G. § 4B1.2(b); *see id.* § 4B1.1(a). To decide whether a state trafficking offense fits this definition under our usual "categorical" approach, we must ask whether its elements require every defendant who commits the crime to have distributed a controlled substance (or possessed it with an intent to distribute). *See United States v. Smith*, 960 F.3d 883, 887 (6th Cir. 2020). If not, the offense does not count even if the specific defendant

before the court engaged in this conduct. *See id.* Unfortunately for Sharp, we already held in *Smith* that his Ohio trafficking offenses satisfy this categorical test. *See id.* at 889.

That may be so, Sharp responds, but *Smith* did not consider his distinct argument: the Ohio statutory scheme treated hemp as "marijuana" at the time of his prior convictions, but Congress and the Ohio legislature have since removed hemp from their respective "marijuana" definitions. So at the time of Sharp's convictions, a defendant hypothetically could have violated the Ohio statute by distributing hemp. Yet at the time of Sharp's sentencing, that conduct would not have qualified as the distribution of a "controlled substance" under the current statutes. Sharp thus argues that the older Ohio statute under which he was convicted is overbroad and not categorically a "controlled substance offense" under the current career-offender guideline.

We disagree because of our opinion in *United States v. Clark*, 46 F.4th 404 (6th Cir. 2022). When considering a similar "hemp" challenge to a career-offender enhancement, *Clark* held that we must compare a defendant's prior conviction to the drug schedules in place at the time of the defendant's earlier *conviction*, not those in place at the time of the defendant's current *sentencing*. *Id.* at 408–11. Sharp's claim lacks merit under *Clark*'s binding "time-of-conviction rule." *Id.* at 408; *see United States v. Baker*, 2022 WL 17581659, at *2 (6th Cir. Dec. 12, 2022); *United States v. Edmonds*, 2022 WL 3867560, at *2 (6th Cir. Aug. 30, 2022). At the time of his Ohio convictions in 2015 and 2017, Sharp concedes that both the state and federal drug schedules still included hemp. *See* Appellant's Br. 51–52. His Ohio convictions for marijuana trafficking thus encompassed no conduct that would fall outside the definition of "controlled substance offense" using the drug schedules in effect at that time. *See Smith*, 960 F.3d at 889. As a result, the district court properly held that the offenses qualified for career-offender treatment.

F. *Ineffective Assistance*. Sharp lastly argues that his lawyer performed ineffectively in violation of the Sixth Amendment. This argument faces a procedural problem. We rarely review ineffective-assistance claims on direct appeal and usually save them for collateral proceedings under 28 U.S.C. § 2255. *See United States v. Manzano*, 793 F. App'x 360, 367 (6th Cir. 2019); *United States v. Sypher*, 684 F.3d 622, 626 (6th Cir. 2012). To prove these claims, defendants typically must present outside-the-record evidence showing what counsel did and did not do behind the scenes. *See Massaro v. United States*, 538 U.S. 500, 504–05 (2003). Yet defendants cannot present this evidence on appeal. *See id.* So an appellate resolution of their ineffective-assistance claims could harm them. If we rejected the claims because the defendants lacked the required evidence, ordinary preclusion rules might bar them from reasserting the claims with new evidence in a § 2255 motion. *See Manzano*, 793 F. App'x at 367. Except in the unusual case in which the trial record leaves no need for factual development, then, we channel these claims to § 2255 proceedings. *See id.*; *United States v. Ferguson*, 669 F.3d 756, 762–63 (6th Cir. 2012).

We follow this course here. Sharp does not specifically identify how his counsel performed ineffectively. And he concedes that we would "need further information" to resolve the claim. Appellant's Br. 60. We thus will not review it now. We instead will save it for any post-conviction proceedings that Sharp may pursue under § 2255. *See Ferguson*, 669 F.3d at 762–63.

We affirm.